## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH ARPAIO,

                          Plaintiff,

        v.

BARACK OBAMA, ET AL.                              Case 1:14-cv-01966

                          Defendants.

## MOTION FOR PRELIMINARY INJUNCTION
## AND REQUEST FOR ORAL ARGUMENT THEREON

### I.      INTRODUCTION

President Barack Obama announced on November 20, 2014, that he, on his own

authority, is granting legal status in the United States and the legal right to work in the United

States to approximately 4.7 million nationals of other countries who have entered the country

illegally or have illegally remained in the United States. This is in addition to the approximately

1.5 million illegal aliens eligible for President Obama's prior June 15, 2012, Deferred Action for

Childhood Arrivals (DACA) program.  Under these two programs, some whom are eligible may

not choose to apply and thus the programs collectively offer a form of amnesty to approximately

6 million illegal aliens.[1]

        Simultaneously with making his November 20, 2014 announcement, and before and after,

the President has offered to withdraw and cancel these programs if Congress passes the type of

---

[1] Defendants did not announce a name for the November 20, 2014, programs, but refer to them collective as "Executive Action."   Plaintiff attempts to refer to them as "Executive Order Amnesty."

immigration legislation that he favors.  Thus, the programs are not grounded in the specialized

expertise of government agencies but in the political horse-trading of lobbying Congress.

The Executive Branch under the Administration of President Obama has changed the law

of the United States with regard to immigration and the presence of aliens who are working in

the country, by giving a speech followed by "guidance" Memoranda being issued by the

Secretary of the Department of Homeland Security.  It appears that no other department or

agency has taken any action or issued any guidance on the subject, including the U.S.

Department of Justice or U.S. Department of State; though they may in the future.

The parties are in agreement – or at least the Plaintiff and the Office of Legal Counsel at

the U.S. Department of Justice agree – that Defendants' Executive Order Amnesty is unlawful

and invalid unless it qualifies as valid prosecutorial discretion.  Plaintiff argues it does not

qualify and therefore it is legislation or regulation affecting broad categories of approximately 6

million illegal aliens.  Defendants recite that they will consider applicants on a case-by-case

basis.  Plaintiff rejects this claim as phony and disingenuous because there is nothing remaining

for a Departmental official to decide, and no standards or criteria to guide any further decision.

The Memoranda establish complex and detailed rules governing broad categories of

persons and circumstances.  The very nature of the programs is to create a standardized approach

which produces exactly the same result in each and every case.  There is only one possible

outcome which is granted to all whom meet the general criteria.  Replacing individual

consideration with one sweeping, standardized result is Defendants' goal.

These abuses by the Executive Branch are not limited to the Administration of the current

President.  The current President justifies these programs largely on the claim that prior

Presidents established a practice which the current Defendants now continue.  Plaintiff contests

those practices regardless of which Presidential Administration originated them.

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  - Article I, Section 1, U.S. Constitution.  "The executive Power shall be vested in a President of the United States of America." Article II, Section 1, U.S. Constitution.

As a result, legislation and national policy are enacted by Congress, not by the President. The President's executive responsibilities are to execute, that is implement, the laws enacted by Congress.  In some limited cases, the Congress delegates quasi-legislative authority to the Executive Branch.  However, the exercise of delegated authority requires compliance with a variety of restrictions and limitations.

## II.  REQUEST FOR ORAL ARGUMENT

Plaintiff, by counsel, respectfully requests oral argument upon the motion.

## III. STATEMENT OF FACTS

### A.  Obama Administration's June 15, 2012, Deferred Action for Childhood Arrivals (DACA) Amnesty

By Memorandum dated June 15, 2012, Secretary of Homeland Security Janet Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* a copy of which is attached as Exhibit A, addressed to U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enforcement (ICE).  Key features include:

1. The core legal substance of the Memorandum is asserted to be *how* the Department of Homeland Security "should" "enforce" the Nation's immigration laws within the Department's prosecutorial discretion.

2. The Memorandum addresses enforcement against "certain" young people who

were brought to the country as children and "know only this country as home."

**3.** The Department admits by the Memorandum that the Nation's immigration laws must be enforced in a strong manner.

**4.** It asserts that "It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law."

**5.** The Deferred Action for Childhood Arrivals (DACA) program created by the Memorandum sets forth five (5) criteria on Page 1 plus one (1) further requirement for a background check on Page 2, which six (6) criteria define broad categories of persons estimated to total 1.5 million illegal aliens.

**6.** On Page 2, the Memorandum recites that "[R]equests for relief pursuant to this memorandum are to be decided on a case by case basis.  DHS cannot provide any assurance that relief will be granted in all cases."

**7.** The Memorandum asserts that the Nation's immigration laws are not designed to be blindly enforced without consideration given to the individual circumstances of each case.

Creating key disputes among the parties on the above, the Plaintiff contends that:

1. The reality is that the DACA Memorandum is regulatory rule-making, though in violation of the steps and requirements of the Administrative Procedures Act.

2. The Memorandum's recitation of case-by-case decisions is plainly a fiction.

3. There are no standards by which a subordinate Department official would ever deny a request for DACA relief, and no guiding principle to be followed by a line official of the Department applying the DACA program to any individual person.

4. Therefore, if it is true that a request for DACA relief will be decided on a case-by-

case basis, there is no standard or criteria to guide that exercise of a subordinate official's discretion other than his or her mere whim or personal opinion.

5. The Memorandum and Defendants' DACA program are self-contradictory and cynical. The DACA Memorandum simultaneously purports to set one consistent policy mandating a single approach to prosecutorial discretion throughout the Department. Yet Defendants pretend that decisions are made on a case-by-case basis. Is the prosecutorial discretion exercised by the Secretary or by the ICE or USCIS "line" official dealing with an individual case?

6. DACA is not a deferred action consistent with any past precedent but is a dramatic expansion of and departure from any past examples in both scale and type.

7. Plaintiff rejects the assumptions of the Memorandum that the Nation's immigration laws are "designed" to be modified by the Executive Branch according to the individual circumstances of each case. The Nation's immigration laws mean what they say. The DACA Memorandum assumes that it is the role of the Executive Branch to second-guess the wisdom of Congressional policy.

**B. Obama Administration's November 20, 2014 Executive Action Amnesty**

On November 20, 2014, President Obama announced significant further changes to the immigration laws, regulations, and practices by the Federal government implementing the nation's immigration laws and regulations. The President's new policies announced in an evening speech to the nation were implemented through a number of orders issued by the Secretary of the Department of Homeland Security issued at President Obama's directive.

A few hours before the President's evening speech, on November 20, 2014, the U.S. Department of Justice released publicly and posted on the Department's website for unrestricted

public viewing, a 33-page legal Memorandum titled *"The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others"* revealing the legal analysis and advice of the U.S. Department of Justice Office of Legal Counsel (OLC).  The legal memorandum is dated November 19, 2014.  A copy downloaded from the website is attached as Exhibit B.

The OLC legal memorandum was released by the Obama Administration for the purpose of adding to the public debate about the Defendants' executive action programs and convincing the public and officials of the legality of the program.  In fact, the OLC legal memorandum attached as Exhibit B was made a part of the public record in a hearing in the Judiciary Committee of the U.S. House of Representatives on December 2, 2014, on "Executive Action on Immigration" by the Committee's Ranking Member Mr. John Conyers.

Page 3 presents a very useful summary of the overall processes and players involved.

### C.   MEMORANDUM:  "Policies Supporting U.S. High-Skilled Businesses"

On November 20, 2014, Secretary Johnson issued a Memorandum Order titled *"Policies Supporting U.S. High-Skilled Businesses"* to USCIS and ICE, a copy of which downloaded from the Department's website is attached as Exhibit C.  In this Memorandum, the Secretary admits that the changes directed require regulatory rule-making under the Administrative Procedures Act.  For example, "Specifically, USCIS should consider amending its regulations to ensure that approved, long-standing visa petitions remain valid in certain cases where they seek to change jobs or employers." Exhibit C at 2.  And "More specifically, I direct that Immigration and Customs Enforcement (ICE) and USCIS develop regulations for notice and comment to expand the degree programs eligible for OPT and extend the time period and use of OPT for foreign STEM students and graduates, consistent with law." *Id. at* 3.

D.  **MEMORANDUM: "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents**"

In the main document at issue here, on November 20, 2014, Secretary Johnson issued a Memorandum Order titled *"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents"* to the USCIS, ICE, Customs and Border Protection (CBP), and Acting Assistant Secretary for Policy Alan D. Bersin, a copy of which downloaded from the Department's website and is attached as Exhibit D.  Key features include:

1. This Memorandum - *which is the primary document of the programs in dispute -* acknowledges that the intent and effect is to change current law, stating on Page 1:

   > This memorandum is intended to reflect new policies for the use of deferred action.

2. The Memorandum expands DACA by removing the previous age cap, adjusting the date of entry limit, and lengthening the renewal period to three years.

3. The Memorandum also extends DACA-like deferred action to new categories of persons who are illegal aliens (who arrived illegally or over-stayed as adults) but have a son or a daughter who is a U.S. citizen or lawful permanent resident and who also satisfy six (6) other criteria including passing a background check.

4. One of the factors is that the applicant must "present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate."

5. The legal substance of the Memorandum is grounded on the assertion that:

   > Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law.

6. This key Memorandum further states:

> Provided they do not commit serious crimes or otherwise become
> enforcement priorities, these people are extremely unlikely to be
> deported given this Department's limited enforcement resources-which
> must continue to be focused on those who represent threats to national
> security, public safety, and border security.

7. While defining and describing deferred action, the Memorandum admits that there

is no lawful authority for the deferred action, but instead it is an "administrative

mechanism" whose authority is that it has been engaged in (the Memorandum

claims) by other Presidential Administrations in the past.

8. The Defendants admit by the Memorandum that

> As an act of prosecutorial discretion, deferred action is legally available
> so long as it is granted on a case-by-case basis, and it may be
> terminated at any time at the agency's discretion.

9. The Defendants admit by the Memorandum that

> Although deferred action is not expressly conferred by statute, the
> practice is referenced and therefore endorsed by implication in several
> federal statutes.

10. In this key Memorandum, the Secretary of Homeland Security instructs that:

> By this memorandum, I am now expanding certain parameters of
> DACA and issuing guidance for case-by-case use of deferred action for
> those adults who have been in this country since January 1, 2010, are
> the parents of U.S. citizens or lawful permanent residents, and who are
> otherwise not enforcement priorities, as set forth in the November 20,
> 2014 Policies for the Apprehension, Detention and Removal of
> Undocumented Immigrants Memorandum.

11. USCIS is to begin accepting applications within 180 days of the Memorandum.

12. A fee of $465 is required, which includes the application for work authorization.

Similar to the Plaintiff's dispute with the DACA Memorandum:

1. While one criteria is that an applicant "present no other factors that, in the exercise

8

of discretion, makes the grant of deferred action inappropriate" this does not

provide any meaningful standard other than mere whim or personal preference of

the line official.  It is not credible that any applicant will ever actually be evaluated

on a case-by-case basis or denied application.  If a line official did actually deny

deferred action status, there are no governing standards or criteria for the line

official to follow.

2.   Plaintiff contends that deferred action is an *ultra vires* violation of the limited

authority delegated to the Executive Branch.

3.   Plaintiff further contends that Defendants' programs exceed the boundaries of past

uses of deferred action, and are a dramatic expansion of and departure from any

past examples in both scale and type.

4.   Moreover, the Obama Administration ignores the law's restrictions on the use of

delegated authority within criteria established by Congress.  The Administration

believes that delegated authority is unlimited and is an invitation for the Executive

Branch to question the wisdom of Congress' statutory enactments.

E.  **MEMORANDUM:  "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents"**

In the second most important Memorandum Order for our purposes here, on November

20, 2014, Homeland Security Secretary Jeh Charles Johnson issued a Memorandum Order titled

*"Expansion of the Provisional Waiver Program"* to USCIS, ICE and Customs and Border

Protection, a copy of which downloaded from the Department's website is attached as Exhibit E.

Key features include:

1.   The Secretary admits that it is necessary for DHS to amend its 2013 regulation on

Page 2 – that is to engage in regulatory rule-making under the Administrative Procedures Act:

> Today, I direct DHS to amend its 2013 regulation to expand access to the provisional waiver program to all statutorily eligible classes of relatives for whom an immigrant visa is immediately available.

2.  The main issue is that relatives are ineligible (inadmissible) because they have violated immigration laws, which acts as a barrier to applying for lawful status. An "inadmissible" alien must return to their home country and wait 3 to 10 years.

3.  The Memorandum expands the waiver of inadmissibility for family members of U.S. citizens and lawful permanent residents.  In 2013, the DHS issued regulations through the rule-making process to relieve spouses and minor children of the requirement to return to their home country and apply there, as a result of being inadmissible to apply for immigration status.  The Memorandum expands the waiver of inadmissibility to more categories of family members.

4.  However, the Secretary of Homeland Security admits that the change requires regulatory rule-making under the Administrative Procedures Act to achieve, because they are legislative.

### F.  **MEMORANDUM:  "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants."**

In a less important (for the purposes of this instant case), yet generally instructive, Memorandum, on November 20, 2014, Homeland Security Secretary Jeh Charles Johnson issued a Memorandum Order titled *"Policies for the Apprehension, Detention and Removal of Undocumented Immigrants"* to USCIS, ICE and Customs and Border Protection, a copy of which was downloaded from the Department's website and is attached as Exhibit F.

This Memorandum sets forth extensive details and discussion about the prioritization of

the Executive Branch's actions with regard to different categories of persons unlawfully present within the United States.  The Memorandum extensively discusses the Executive Branch's view of its powers under prosecutorial discretion.  The Memorandum is informative as to the overly-expansive concepts of prosecutorial discretion that the Defendants apply throughout this topic.

However, this Memorandum concerns internal prioritization of the Department's work, and does not grant affirmative benefits such as amnesty to certain illegal aliens, which is the essence of the current dispute.   Plaintiff disagrees with much of the concepts asserted and the practices adopted by the Memorandum.  Nevertheless, the Memorandum, does not directly award benefits to illegal aliens.  Still, the Plaintiff's presentation would be incomplete and unfair to the Court if only some of the November 20, 2014 Memoranda were presented.

## III.    ARGUMENT

### A.   GOVERNING LAW / STANDARD OF REVIEW

To obtain injunctive relief, Plaintiff need only demonstrate (1) a substantial likelihood of success on the merits; (2) that they are likely to suffer "irreparable injury" if preliminary relief is not granted; (3) that an order would not substantially injure other interested parties; and (4) that the public interest would be furthered by granting the order. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 843 (D.C. Cir. 1977); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010). These four factors must be viewed as a continuum where greater strength in one factor compensates for less in the other: "If the arguments for one factor are particularly strong, in injunction may issue even if the arguments in other areas are rather weak." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 739, 747 (D.C. Cir. 1995).

**B.   NO  SUBSTANTIAL INJURY TO DEFENDANTS FROM ISSUANCE OF A PRELIMINARY INJUNCTION AND STATUS QUO OF CURRENT LAW**

As a matter of law, Defendants cannot be said to be "burdened" by a requirement to continue to comply with existing law as enacted by Congress.  The Defendants have announced that their program is explicitly intended to depart from governing law.  However, the status quo is both a set of circumstances that have existed for many years and also the law of the land pursuant to existing statutory law enacted by Congress.  There can be no burden recognized by the law from continuing to obey and apply the law as it currently exists.  There can be no burden recognized by the law that political leaders desire to adopt new and different policies.

Furthermore, the main asserted purpose of the programs is a fiction, since the Executive Branch is not deporting illegal aliens in any significant numbers, even those convicted of non-immigration related crimes within the United States.  The Defendants' programs purpose is to give illegal aliens a certificate that they will not be deported.  Either way, with or without a certificate, those illegal aliens are very unlikely to be deported.

President Obama and others recite that the immigration system of the United States is broken.  Of course, it is unmistakable that the only thing that is broken about the nation's immigration laws is that the Defendants are determined to break those laws themselves and also reward those nationals of foreign countries who break U.S. law.  The Defendants both conspicuously fail to identify any other way in which the immigration laws are broken but also announce unambiguously their desire to reject the immigration laws of the U.S.

In contrast to the substantial irreparable harm facing Plaintiff and the nation, there can be no credible claim of harm to Defendants.  The status quo is the existing law of the United States of America as enacted by the Congress and signed into law by various past Presidents.  There is no harm to waiting until legal challenges are resolved.

C.  **THE BALANCE OF HARM AS WELL AS THE PUBLIC INTEREST SUPPORTS THE IMPLEMENTATION OF A PRELIMINARY INJUNCTION**

An injunction is warranted because "there is an overriding public interest… in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. V. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). The public has a substantial interest in Defendants following the law. *See, e.g., In re Medicare Reimbursement Litigation*, 414 F.3d 7, 12 (D.C. Cir. 2005) (Additional administrative burden "[would] not outweigh the public's substantial interest in the Secretary's following the law.")

Given Defendants' fundamental refusal to comply with the law, the public interest will be served if this court preliminarily enjoins Defendants from implementing their illegal and unconstitutional actions.  In light of the fact that Defendants' programs will dramatically change the status quo, a preliminary injunction to allow for the evaluation of such questions clearly serves the public interest. *See Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 130 (D.D.C. 2012) (holding that "there is undoubtedly . . . a public interest in ensuring that the rights secured under the First Amendment . . . are protected"); *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (holding that "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" free of constitutional violations). *See also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 54 (D.D.C. 2002) (holding that the public interest is served by a court order that avoids "serious constitutional risks"); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting "the general public interest served by agencies' compliance with the law"); *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.,* 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by enforcing constitutional requirements).

**D. PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS WITHHELD**

Allowing the Executive Branch to immediately implement the President's DACA and Executive Amnesty programs will cause irreparable harm, including to those illegal aliens the programs seek to enroll, if the Federal courts later determine the programs to be unlawful.

Sheriff Joe Arpaio's office and deputies, as illustrated in the Exhibits attached to the Complaint, will suffer the loss of resources and funding diverted to handle the flood of increased illegal immigration, the danger to deputies enforcing the law, and an increase in crime in his County. As set forth in his Declaration, attached as Exhibit G, real-world experience has demonstrated this. Those who cross the border without resources, without a job, without a bank account, and without a home in the U.S., who are willing to break the law to achieve their purposes, and who are released from any social stigma in their home communities where they are known are correlated with an increase in crime in Maricopa County, Arizona. This includes when they cross through Arizona.

Citizens of other countries who are present in the United States unlawfully will be asked to pay fees of at least $465 each to the Department of Homeland Security and to change their circumstances in many ways in reliance upon the Defendants' executive action programs. To unravel the changed circumstances later would be an inexcusable unfairness to all concerned, including illegal aliens acting in reliance on and trusting in the Defendants' programs. Fees of $465 and up would have to be refunded to millions of individuals. The work and expenses incurred by the Executive Branch would be wasted by the Federal government on a mass scale.

Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods

14

of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft,* 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

Furthermore, news of the Defendants' programs will serve as an invitation for millions of more trespassers to enter the country.  Postponing the start of the Defendants' executive action programs may not entirely cancel that message, but it will reduce the encouragement for others to enter the country without first testing the legality of these programs.

As a result, Plaintiffs will suffer irreparable harm absent a preliminary injunction. Furthermore, without a preliminary injunction, Defendants would inherently have a significantly greater and substantially unfair advantage in this lawsuit, especially during the pendency of this action, thus depriving Plaintiffs of their right to a fair trial.  The difficulty or near impossibility of unraveling the programs once started would mean that the Defendants have prevailed regardless of the decision of the Courts.  In light of the above, Defendants should be enjoined until such time as the court can address the constitutional and legal issues raised.

### E.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

There is a significant likelihood that the Plaintiff will succeed on the merits, at the very least on the grounds that the Defendants are clearly engaged in regulatory rule-making while flouting and ignoring the requirements of the Administrative Procedures Act.  The following considerations are offered in support of the Plaintiff's allegations and causes of action:

### 1.   Plaintiff Should be Granted Relief Prayed for in the Complaint

a)   Plaintiff is entitled to declaratory relief under his First Cause of Action. The Defendants' 2012 DACA and 2014 Executive Action amnesty programs – including in their sheer scope and fundamentally different nature – usurp the role of Congress

within the architecture and basic design of the U.S. Constitution.  *See infra.*

b)  Under his Second Cause of Action, Plaintiff is entitled to relief from illegal, unconstitutional, and invalid agency action pursuant to 5 U.S.C. §§ 702 through 706 because the Executive Branch under the Defendants' authority and direction is issuing new regulations within the same scope as existing regulations without going through the detailed rule-making process of the Administrative Procedures Act.

c)  Under his Third Cause of Action, Plaintiff is entitled to relief from illegal, unconstitutional, and invalid agency action pursuant to 5 U.S.C. §§ 702 through 706 because the Executive Branch under the Defendants' authority and direction is creating new regulations and/or interpretations and practices in conflict with existing laws and regulations.  Plaintiff challenges Executive Branch departure from existing laws and regulations including those practices that begun under prior Presidential administrations.  Even where today the Defendants engage in plausible interpretations and applications of the regulations and INA, that treatment is necessarily arbitrary, capricious, arbitrary, an abuse of discretion, unreasonable, and otherwise not in accordance with law because the Executive Branch in years past using its specialized expertise adopted different plausible interpretations and applications of the regulations and INA.  Those inconsistent interpretations and applications cannot both be grounded in the agency's specialized expertise or in the facts and circumstances.

d)  Under his Fourth Cause of Action, Plaintiff is entitled to declaratory judgment that there is no rational relationship between the stated goals of prioritizing the use of enforcement resources and granting benefits to illegal aliens so as to create a massive magnet attracting more illegal aliens to flood across our Nation's borders.  Plaintiff

recognizes that it is very difficult for a government action to fail the legal test of rationality.  And yet here the Executive Branch has created a magnet for further illegal immigration that is absolutely in contradiction to their stated goals of prioritizing the use of limited prosecutorial resources.  Choosing to not deport all classes of persons unlawfully present with equal priority does not require granting some of them benefits and the right to work in the United States.  Part of the difficulty is the Defendants' determination to grant law-breakers a certificate (loosely speaking) that they will not be prosecuted.  If a police department chooses to focus on the most dangerous criminals, others do not receive a certificate authorizing them to continue breaking lesser laws.  But here, the Defendants want to give a sort of certificate authorizing persons to continue breaking the law as long as they do not meet the highest priority for removal (deportation).  *<u>If the Defendants merely focused their efforts where most appropriate, but did not seek to affirmatively grant benefits to other illegal aliens</u>*, there would be no magnet created for additional illegal immigration. The problem of limited resources will grow dramatically worse.

e)  Plaintiff is entitled to declaratory relief under his Fifth Cause of Action that the Defendants' programs are not acts of prosecutorial discretion.  As a result, Defendants are engaged in legislation and/or regulatory rule-making.  This decision leads to the fact that the Defendants' actions are *ultra vires* and illegal.

f)  Plaintiff is entitled to declaratory relief under his Sixth Cause of Action. The Defendants' 2012 DACA and 2014 Executive Action amnesty programs are invalid abuses of delegated authority.  They violate the non-delegation doctrine (limitations upon when delegated authority is valid) recognized in this Circuit under *American*

*Trucking Ass'ns, Inc. v. U.S. Environmental Protection Agency*, 175 F.3d 1027 (D.C. Cir. 1999), *modified on reh'g by* 195 F.3d 4 (D.C. Cir. 1999), *modified by Michigan v. United States EPA*, 213 F.3d 663 (D.C. Cir. 2000) (limiting the scope of *American Trucking*, stating "[w]here the scope increases to immense proportions … the standards must be correspondingly more precise") (citations omitted) *cert. granted sub nom. American Trucking Ass'ns, Inc. v. Browner*, 120 S. Ct. 2193 (2000).

### 2. <u>Defendants' Actions Modify Existing Regulations and are Legislating</u>

President Obama's DACA and Executive Action Amnesty each modify existing regulations governing within the same scope of persons and circumstances.  The fact that Defendants' actions operate within areas already subject to previously-promulgated regulations, underscores that Defendants are legislating and/or rule-making (issuing new regulations) by changing the treatment of these topics within existing regulations.

On Page 2, the OLC Memorandum states that "DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, <u>Congress established a comprehensive scheme governing immigration and naturalization.</u>"  *(Emphasis added).*

Therefore, the Executive Branch admits that Congress has already extensively regulated and occupied the field with regard to immigration and naturalization.

Furthermore, the Executive Branch has officially promulgated extensive regulation pursuant to the Administrative Procedures Act, codified and published at Title 8 of the Code of Federal Regulations.  These regulations cover every aspect of the enforcement of immigration enforcement. The Defendants do not claim now to be addressing any gaps in regulation.  They admit that these matters are already regulated. But Defendants claim a lack of resources requires

them not to fully enforce the law as written.

### 3. Defendants are Legislating in Conflict with Constitutional Requirements

The U.S. Supreme Court has explained concerning the immigration laws:

> In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. But that ***the formulation of these policies is entrusted exclusively to Congress*** has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.

*(Emphasis added). Galvan v. Press*, 347 U.S. 522, 531 (1954) (internal citations omitted, citing

*Kaoru Yamataya v. Fisher* (The Japanese Immigrant Case), 189 U.S. 86, 101 (1903); *Wong Yang*

*Sung v. McGrath*, 339 U.S. 33, 49 (1950).

The U.S. Supreme Court has further explained about the relationship in another case of

Executive Branch over-reach in the context of regulating carbon dioxide:

> Were we to recognize the authority claimed by EPA in the Tailoring Rule, we would deal a severe blow to the Constitution's separation of powers.

and:

> The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice.

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2446 (2014); *see also, Barnhart v. Sigmon*

*Coal Co*., 534 U.S. 438, 462 (2002) (Commissioner of Social Security did not have the authority

"to develop new guidelines or to assign liability in a manner inconsistent with the statute.").

In *Utility Air Regulatory Group*, The U.S. Supreme Court struck down new EPA

regulations regulating certain sources of emissions (primarily relating to greenhouse gases in that

case) differently than how those same emission sources had been regulated in the past. The

Supreme Court added that under "our system of government, Congress makes laws," while the

President executes them.

The U.S. Supreme Court undertook a fundamental analysis of the Constitutional architecture of the U.S. Constitution in *NRLB v. Noel Canning*, 134 S. Ct. 2550 (2014) (recess appointments invalid, reasoning from structure of the Constitution) and *INS v. Chadha*, 462 U.S. 919 (1983).  The U.S. Supreme Court found in *Chadha* that a departure from the normal legislative process violated the U.S. Constitution because it offended the Constitutional architecture and structure of Congressional enactment and presentment to the President.  *See also Kendall v. United States*, 37 U.S. 524 (1838).

Here, the roles are reversed between the Executive Branch and Legislative Branch from *Chadha*, but the Defendants openly admit that their efforts are to subvert the legislative process and the role of Congress, although effectively in a mirror image of *Chadha*.  In *Chadha*, Congress sought to encroach on the executive role of the Executive Branch.  Here, the Executive Branch seeks to legislate where Congress has chosen not to legislate.

Similarly, the U.S. Supreme Court held in *Train v. City of New York*, 420 U.S. 35 (1975) that "[t]he president cannot frustrate the will of Congress by killing a program through impoundment."  That is, the President does not have authority by executive action to not enforce the laws enacted by Congress.   In *Train*, the issue concerned the expenditure of funds in appropriated accounts; the motivation was the President disagreeing on policy grounds with Congress.

Similarly, the U.S. Supreme Court held in *Youngstown Steel & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), that the President does not have inherent authority as executive action to take action outside of the laws enacted by Congress, where Congress refuses to act.

"Of course, an agency is not free simply to disregard statutory responsibilities: Congress

may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes. . . " *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). *See also* 18 Comp. Gen. 285, 292 (1938) ("[T]he question with the accounting officers is not the apparent general merit of a proposed expenditure, but whether the Congress, controlling the purse, has by law authorized the expenditure").

Plaintiff maintains that the rationale of these cases mandates that the President must go through the proper legislative process through Congress and "presentment" of a statute to the President for veto or signature and that the role of the President is to take care that the laws be faithfully executed, and not for the President to legislate on his own authority.   President Obama's programs are a breath-taking case of chutzpah of first impression beyond what past Presidents would have ever attempted.   Yet the rationale of those past cases clearly applies here.

An Executive Branch agency's duty is to comply with the law and the courts' duty is to make sure it does so. "Once Congress . . . has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *TVA v. Hill*, 437 U.S. 153, 194 (1978).

> A President sometimes has policy reasons (as distinct from constitutional reasons, cf. infra note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill. See 2 U.S.C. § 683; see also *Train v. City of New York*, 420 U.S. 35,  95 S.Ct. 839,  43 L.Ed.2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)

### 4.  <u>No Legal Authority to Grant Legal Status to Illegal Aliens</u>

"The Congress shall have Power . . . To establish an uniform Rule of Naturalization," Article I, Section 8, of the U.S. Constitution.

There is nothing in the U.S. Constitution which offers any shared authority or role with the Executive Branch with regard to immigration, admission of aliens to the country, or naturalization or citizenship other than the President's duty that he "shall take Care that the Laws be faithfully executed. . . ." Article II, Section 3, of the U.S. Constitution.

Congress must provide some legal category under which an alien may be lawfully present within the United States of America or admitted into the country.  The authority to waive inadmissibility does not qualify a national of another country for lawful presence, lawful admission, or benefits.  Waiving inadmissibility merely allows an alien to apply for a lawful status – assuming he qualifies for it.

Inadmissibility means that even if they otherwise qualify for a category of lawful presence, a legal barrier has been created.  A few simple examples include:

> 8 U.S. Code § 1182 - Inadmissible aliens
> (a)(9) Aliens previously removed
>> (A) Certain aliens previously removed
>>> (i) Arriving aliens
>>> Any alien who has been ordered removed under section 1225 (b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

and:

> 8 U.S. Code § 1182 - Inadmissible aliens
> (a)(6) Illegal entrants and immigration violators
>> * * *

(C) Misrepresentation
(i) In general
Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

If the Defendants were merely issuing internal guidance as to which illegal aliens to deport first, there would be no objection.  Instead, it is the affirmative grant of benefits that is the objectionable aspect of the Defendants' actions.  Defendants are granting amnesty and immunity from prosecution (deportation), authority, and written authorization to continue to break the law, Employment Authorization Cards for the right to work, the opportunity to use work authorization cards to get a State driver's license, the opportunity to use that driver's license to register to vote unlawfully, and the right to receive various other benefits including public assistance.

As a result, the Defendants' programs are legislation, conferring new benefits to broad categories of persons based upon standardized criteria defining broad classes of beneficiaries.

**5.**   **Unless Subordinate Officials Can Say "No," No Case-by-Case Review Exists**

This Court is empowered to review the Defendants' claim to prosecutorial discretion in the civil enforcement of Congressional enactments.  *Adams v. Richardson*, 156 U.S. App. D.C. 267, 480 F.2d 1159 (1973) *(en banc)*.

In issuing a (modified) injunction, this Circuit rejected claims that agency discretion not to fully enforce laws (in a civil context) was unreviewable by this Circuit:

Appellants insist that the enforcement of Title VI is committed to agency discretion, and that review of such action is therefore not within the jurisdiction of the courts. But the agency discretion exception to the general rule that agency action is reviewable under the Administrative Procedure Act, 5 U.S.C. Secs. 701-02, is a narrow one, and is only "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No. 752, 79th Cong., 1st Sess., 26 (1945)." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). The terms

23

> of Title VI are not so broad as to preclude judicial review. A substantial and authoritative body of case law provides the criteria by which noncompliance can be determined, and the statute indicates with precision the measures available to enforce the Act.

*Id.*  This Circuit distinguished discretion by the Attorney General or by U.S. Attorneys (prosecutors) presumably in a criminal context from enforcement by civil Departments:

> Appellants rely almost entirely on cases in which courts have declined to disturb the exercise of prosecutorial discretion by the Attorney General or by United States Attorneys. *Georgia v. Mitchell*, 146 U.S.App.D.C. 270, 450 F.2d 1317 (1971); *Peek v. Mitchell*, 419 F.2d 575 (6th Cir. 1970); *Powell v. Katzenbach*, 123 U.S.App.D.C. 250, 359 F.2d 234 (1965); *Moses v. Katzenbach*, 342 F.2d 931 (D.C.Cir.1965). Those cases do not support a claim to absolute discretion and are, in any event, distinguishable from the case at bar. Title VI not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures. The absence of similar specific legislation requiring particular action by the Attorney General was one factor upon which this court relied in *Powell v. Katzenbach*, 123 U.S.App.D.C. 250, 359 F.2d 234, 235 (1965), to uphold the exercise of discretion in that case.

*Id.*  Moreover, this Circuit recognized that widespread _scope_ of non-enforcement can be fundamentally different than small-scale exceptions, as (1) adopting a conscious policy in conflict with the Congressional enactment, and (2) an abdication of statutory duty, from case-by-case prosecutorial discretion.  As here, the widespread refusal to enforce a law is a fundamentally different thing altogether from prosecutorial discretion:

> More significantly, this suit is not brought to challenge HEW's decisions with regard to a few school districts in the course of a generally effective enforcement program. To the contrary, appellants allege that HEW has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty. We are asked to interpret the statute and determine whether HEW has correctly construed its enforcement obligations.

*Id.*  Moreover, this Circuit recognized the distinction between not enforcing violations as opposed to facilitating on-going violations of the law:

> It is one thing to say the Justice Department lacks the resources

> necessary to locate and prosecute every civil rights violator; it is quite another to say HEW may affirmatively continue to channel federal funds to defaulting schools. The anomaly of this latter assertion fully supports the conclusion that Congress's clear statement of an affirmative enforcement duty should not be discounted.

*Id.*

The OLC legal Memorandum (Exhibit B) strongly depends on the existence of a genuine,

*bona fide*, case-by-case decision-making process to qualify as prosecutorial discretion.

As the Office of Legal Counsel has previously determined, the Executive Branch cannot

refuse to enforce laws based on policy differences with Congress or policy "discretion" --

> "Finally, we emphasize that this conclusion *does not permit the President to determine as a matter of policy discretion which statutes to enforce*. The only conclusion here is that he may refuse to enforce a law which he believes is unconstitutional. Obviously, the argument that the President's obligation to defend the Constitution authorizes him to refuse to enforce an unconstitutional statute does not authorize the President to refuse to enforce a statute he opposes for policy reasons."

Issues Raised by Section 102(c)(2) of H.R.3792, 14 Op. Off. Legal Counsel 37, 1990 WL

488469, *11 (1990).  *(Emphasis added).*

Therefore, the claim that Department of Homeland Security "line" officials actually

dealing with individual illegal aliens may simply disregard the laws passed by Congress on their

own discretion requires something vastly higher than simply sprinkling throughout the

Memoranda the phrase "case-by-case review" like garlic to repel judicial review.  Thus the

recitation claiming a case-by-case review is, as a legal term of art, a <u>pretext</u>.

Yet, here, Defendants' Memoranda issued to the DHS actually replace individual

decision-making with mass standardization.  Indeed, that is the point of the Defendants'

programs:  to assure 6 million illegal aliens that they will not be deported.

There is no possibility that any illegal alien will be denied the one and only deferred

action status offered on any individualized basis if the broad criteria of the regulatory scheme are satisfied. [2]  The millions of persons who meet the regulatory criteria get only one possible result. Those who do not meet the regulatory criteria do not get that result, and receive no change from their current status.  There is only one possible outcome for all those who qualify under the criteria, not a range of outcomes.  There are no individually-tailored "plea deals."

The Defendants' Memoranda recite that there will be a case-by-case review, but do not provide any topic concerning what the case-by-case review might be *about*.  There is no subject matter, no issues to be determined, no rationale for deferred action status to be granted to some and denied to others.  Defendants have merely inserted empty buzz words into the Memoranda.

However, if there is a meaningful case-by-case review, then subordinate officials must be free to answer "no."  Defendants claim that the reason for their programs is a lack of resources. Therefore, a case-by-case review would authorize subordinate Departmental officials to each make their own personal decisions as to whether they believe resources are adequate to deport any particular individual applicant or not.  As a corollary, if the now Republican-controlled Congress increased funding for enforcement, including rapidly by a supplemental appropriation, Departmental officials would be obligated to deport everyone they can until funding is used up.

Contrast this with genuine prosecutorial discretion, where a prosecutor is evaluating whether or not he or she can prove the case against an accused in light of the quality, credibility, and availability of the witnesses and other evidence. *United States v. Armstrong*, 517 U.S. 456,

---

[2] The Chair of the Judiciary Committee of the U.S. House of Representatives reported in a hearing held on December 2, 2014, that the Department had told the Committee that if an applicant meets the published criteria, the applicant will always, without exception, receive the deferred action status.  If that report is not accurate, the Defendants will hopefully clarify that question.  *See* "Executive Action on Immigration," House Judiciary Committee, C-SPAN, December 2, 2014, http://www.c-span.org/video/?323021-1/house-judiciary-committee-hearing-executive-action-immigration

465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan") (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

Evaluating whether a case can be proven provides a meaningful set of standards for a prosecutor to follow, guided by her legal training, yet unique to each case. There is an actual reason for a case-by-case decision-making process when the chance of success is at issue.

Here, the topic being decided is that Defendants reject the wisdom and the policy of the laws Congress enacted. The Defendants having already decided on a national basis that they simply disagree with the policies of existing immigration law enacted by Congress, there is nothing further for any "line" (subordinate) Departmental official to decide case-by-case.

However, under the Defendants' programs, could a subordinate Departmental official decide that he or she actually likes the wisdom of current law and will choose to deny deferred action to applicants? We know the answer is no, because ten border patrol agents sued the Secretary to be allowed to do their jobs and enforce the laws in *Crane v. Napolitano*, 920 F. Supp. 2d 724 (N.D. Tex. 2013). "Line" officials are not permitted to refuse amnesty.

### 6.  OLC Legal Memorandum Warns of Legal Limitations

The OLC's legal Memorandum mostly assumes certain types of actions by the Defendants – which assumptions are not what the Defendants actually created – and then opines that the hypothesized actions would be legal.

On Page 4, the OLC Memorandum states that: "Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 587–88 (1952). These limits, however, are not clearly defined."

Plaintiff asserts that President Obama and the other Defendants have fundamentally

missed the message of *Youngstown Sheet & Tube Co., supra,* which held the contrary.

On Page 6, the OLC Memorandum states that:

> Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

On Page 7, the OLC Memorandum states that:

> Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

On Page 11, the OLC Memorandum states that:  "And, significantly, the proposed policy

does not identify any category of removable aliens whose removal may not be pursued under any

circumstances." However, in fact, the Defendants' policy does grant approximately 6 million

illegal aliens exemption from deportation.  Indeed, that it is the purpose of the program, to give

the promise and certainty to those illegal aliens that they will not be deported.

Concerning the Defendants June 15, 2012, DACA Program, on Page 18, the OLC

Memorandum states in footnote 8 that:

> Before DACA was announced, our Office was consulted about whether
> such a program would be legally permissible. As we orally advised, our
> preliminary view was that such a program would be permissible,
> provided that immigration officials retained discretion to evaluate each
> application on an individualized basis. We noted that immigration
> officials typically consider factors such as having been brought to the
> United States as a child in exercising their discretion to grant deferred
> action in individual cases. We explained, however, that extending
> deferred action to individuals who satisfied these and other specified
> criteria on a class-wide basis would raise distinct questions not
> implicated by ad hoc grants of deferred action. We advised that it was
> critical that, like past policies that made deferred action available to
> certain classes of aliens, the DACA program require immigration
> officials to evaluate each application for deferred action on a case-by-
> case basis, rather than granting deferred action automatically to all
> applicants who satisfied the threshold eligibility criteria.

On Page 24, the OLC Memorandum states that:

> Immigration officials cannot abdicate their statutory responsibilities under
> the guise of exercising enforcement discretion. *See supra* p. 7 (citing
> *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program
> should leave room for individualized evaluation of whether a particular
> case warrants the expenditure of resources for enforcement. *See supra* p. 7
> (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37
> F.3d at 676–77).  Furthermore, because deferred action programs depart in
> certain respects from more familiar and widespread exercises of
> enforcement discretion, particularly careful examination is needed to
> ensure that any proposed expansion of deferred action complies with these
> general principles, so that the proposed program does not, in effect, cross
> the line between executing the law and rewriting it.

In general, the OLC Memorandum relies for the authority for deferred action on the fact

that the Congress has not yet acted to stop the practice, despite being aware of deferred action.

**7.   Admissions By Party Opponent Obama – these Executive Actions are Illegal**

Especially for the purposes of a preliminary injunction, the extensive admissions by the party-opponent Defendant Barack Obama (estimated to number at least 22 on separate occasions) that these actions violate Constitutional principles and legal requirements are strong grounds for issuing a preliminary injunction pending further proceedings in this Court:

As an admission against interest by a party-opponent, Defendant Barack Obama admits that he changed the law in this area.  During a public, official speech[3] at Copernicus Community Center in Chicago, Illinois, as President, President Barack Obama was interrupted by screams from immigration protesters.  Obama told the protesters it "doesn't make sense to yell at me right now," given his immigration action last week.  "What you're not paying attention to is, I just took an action to change the law," he said as the crowd applauded.

President Obama has repeatedly admitted and acknowledged that the amnesty he now attempts to issue to illegal aliens is illegal and/or unconstitutional, and he knows it.

> The problem is that, you know, I am the President of the United States.  I am not the Emperor of the United States.  My job is to execute laws that are passed.  And Congress right now has not changed what I consider to be a broken immigration system.  And what that means is that we have certain obligations to enforce the laws that are in place even if we think that in many cases the results may be tragic.

- President Obama, February 14, 2013, in an internet town hall with young voters called a "Google hangout." Available at:  https://www.youtube.com/watch?v=FSV9n-v_0KI

President Obama told the National Council of La Raza on July 25, 2011:

---

[3] "Obama to immigration hecklers: 'I just took an action to change the law,' Eric Bradner (CNN), Nov. 25, 2014 , KBMT, Channel 12, ABC News, Beaumont, Texas, http://www.12newsnow.com/story/27483218/obama-to-immigration-hecklers-i-just-took-an-action-to-change-the-law   See, video, at https://www.youtube.com/watch?v=L8EoAYTRjw4

> I know some people want me to bypass Congress and change the laws on
> my own. Believe me, the idea of doing things on my own is very tempting.
> I promise you. Not just on immigration reform. But that's not how our
> system works. That's not how our democracy functions. That's not how
> our Constitution is written.

President Obama told a roundtable of Spanish-language news media reporters in

September 2011:

> I just have to continue to say this notion that somehow I can just change
> the laws unilaterally is just not true," he said. "We are doing everything
> we can administratively. But the fact of the matter is there are laws on the
> books that I have to enforce.

President Obama answered a heckler during a speech in San Francisco at the Betty Ann

Ong Recreation Center in 2013, by saying:

> If, in fact, I could solve all these problems without passing laws in
> Congress, then I would do so . . . but we're also a nation of laws. That's
> part of our tradition. So the easy way out is to try to yell and pretend like I
> can do something by violating our laws, and what I'm proposing is the
> harder path which is to use our democratic processes to achieve the same
> goal that you want to achieve.

In an interview on the Telemundo television network with Jose Diaz-Balart on September

17, 2013,[4] President Obama said he was proud of having protected the "Dreamers" — people

who came to the United States illegally as young children — from deportation. But he also said

that he could not apply that same action to other groups of people.

> Here's the problem that I have, Jose.  And I've said this consistently.  My
> job in the Executive Branch is supposed to be to carry out the laws that are
> passed.  Congress has said here is the law when it comes to those who are
> undocumented.  And they've allocated a whole bunch of money for
> enforcement.  And what I have been able to do is to make a legal argument
> that I think is absolutely right, which is that given the resources we have
> we can't do everything that Congress has asked us to do.  What we can do
> is then carve out the Dream Act folks, saying young people who've
> basically grown up here are Americans we should welcome.  We're not
> going to have them operate under a cloud, under a shadow.

---

[4] NOTICIAS TELEMUNDO, https://www.youtube.com/watch?v=wp68QI_9r1s

> But if we start broadening that, then essentially I'll be ignoring the law in a way that I think would be very difficult to defend legally. So that's not an option and I do get a little worried that advocates of immigration reform start losing heart and immediately thinking well, you know, somehow there's an out here. If Congress doesn't act, we'll just have the President sign something and that will take care of. We won't have to worry about it. What I've said is that there is a path to get this done and that's through Congress. And right now everybody should be focused on making sure that that bill that's already passed out of the Senate hits the floor of the House of Representatives.

President Obama said the nation's laws were clear enough "that for me to simply, through executive order, ignore those congressional mandates would not conform with my appropriate role as president." Obama said this at a Town Hall in March of 2011,[5] months before issuing his Deferred Action for Children Arrivals (DACA) to keep children who arrived illegally with their non-citizen parents ("Dreamers") from being deported.

### 8. <u>Agency Resources Not a Valid Consideration</u>

If the Department does not have sufficient resources to fully enforce the Nation's laws, its remedy is to request those resources, not to create an entirely new and different regulatory scheme, while refusing to enforce that laws on the books.

The U.S. Congress appropriated about $814 million more for ICE than the U.S. Department of Homeland Security requested in and since fiscal year 2006.

The U.S. Congress appropriated nearly $465 million more for USCIS than the U.S. Department of Homeland Security requested in and since fiscal year 2006.

As a result, the Defendants cannot rewrite the immigration laws of the country claiming a lack of resources they never asked for. Clearly, considering that the Congress already

---

[5] "For Obama, Executive Order on Immigration Would Be a Turnabout", Michael D. Shear, <u>The Washington Post</u>, November 17, 2014, http://www.nytimes.com/2014/11/18/us/by-using-executive-order-on-immigration-obama-would-reverse-long-held-stance.html?_r=0

appropriated more than asked for, if the Executive Branch asked for more resources to secure the border and enforce the laws, the Congress would appropriate the resources needed.

As discussed extensively in the OLC legal Memorandum, Exhibit B, and elsewhere, Defendants claim authority primarily on prosecutorial discretion resulting from a supposed lack of resources. However, this factor cannot be entertained as a justification for the Defendants' programs, because the Executive Branch never asked Congress for additional resources.

Yet as the Supreme Court has explained, courts generally should not infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated. *See TVA v. Hill*, 437 U.S. 153, 190 (1978) (doctrine that repeals by implication are disfavored "applies with even greater force when the claimed repeal rests solely on an Appropriations Act"); *United States v. Langston*, 118 U.S. 389, 394 (1886) ("a statute fixing the annual salary of a public officer at a named sum. . . should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years"); cf. 1 GAO, Principles of Federal Appropriations Law at 2-49 (3d ed. 2004) ("a mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation").

Federal courts have recognized that Congress often appropriates money on a step-by-step basis, especially for long-term projects. Federal agencies may not ignore statutory mandates simply because Congress has not yet appropriated all of the money necessary to complete a project. *See City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (when statutory mandate is not fully funded, "the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint").

Each Federal department and agency is required under the Budget and Accounting Act of

1921 (as amended)[6] to forward its projected needs for carrying out its mission to the Office for

Management and Budget in the Executive Office of the President.  OMB then submits a

consolidated budget request for the entire Federal government to the U.S. Congress.

Moreover, the Executive Branch is authorized to impose fines upon employers who

knowingly or flagrantly violate immigration law prohibitions on employing illegal aliens.  8

U.S.C. §1324a.  Those fees, especially on large employers, would provide additional resources.

However, according to the Inspector General of the Department of Homeland Security,

the Obama Administration routinely reduces fines owed by employers violating the law by an

average of 40%.[7]  ICE reduced the fine owed by one employer from $4.9 million to $1 million.

Budget information submitted to Congress by the U.S. Department of Homeland Security

is posted at http://www.dhs.gov/dhs-budget .  *See* Declaration, attached as Exhibit H.

As a result, the bases claimed by the Defendants is a disingenuous pretext.

## 9.  Lack of Resources Not Credible Where Department Officials Restrained

Defendants base the legality of their actions almost entirely on the claim that the

Executive Branch must prioritize the use of limited resources.  However, for many years, the

Executive Branch has forbidden border patrol agents and other immigration officials from fully

doing their jobs.  Border patrol agents actually sued the Secretary of Homeland Security for not

allowing them to do their jobs of enforcing the Nation's immigration laws, that is causing the

border patrol agents in their view to violate existing law by administrative directive that the

agents not follow the law as written.  This is a Federal lawsuit in the public records of the

---

[6] 31 U.S.C. 1101, et seq.; See also, OMB Circular No. A–11 (2014) Section 15:  Basic Budget
Laws, http://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/s15.pdf

[7] "Obama eases penalties for businesses hiring illegal immigrants," by Stephan Dinan, The
Washington Times, February 25, 2015.

Federal courts of which this Court may take judicial notice.[8]

Where the public court records indicate that the Department has directed its existing personnel not to enforce the laws, to the extent that Departmental employees take the action risky to their careers of suing their bosses in Federal court to be allowed to enforce the immigration laws, the Defendants' mere recitation of a lack of resources to enforce the immigration laws of the United States is unpersuasive and cannot be credited.

It might be noted that the Defendants have merely recited without support their lack of resources, but have not substantiated that claim against overwhelming contrary evidence.

### 10. Benefits to Parents of DACA Recipients are Not Lawful

At a minimum, it is not lawful for the Defendants to extend deferred action status to parents of nationals of foreign countries who are illegally present but received deferred action themselves under the Deferred Action for Childhood Arrivals (DACA) program.

Defendants purport to expand DACA-like deferred action to illegal aliens who are parents of (a) U.S. citizens, (b) lawful permanent residents, or (c) DACA recipients.

The Office of Legal Counsel (OLC) on behalf of the Defendants makes clear that deferred action status cannot be extended to parents of deferred action status recipients, based on the deferred action status of the child alone.

On Page 2, the OLC Memorandum states that "We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion." Therefore, the Defendants admit that the

---

[8] *Crane v. Napolitano,* 920 F. Supp. 2d 724 (N.D. Tex. 2013). The case was dismissed by the trial court for lack of subject matter jurisdiction, on the theory that the Executive Branch was effectively suing itself.  The dismissal is on appeal in the Fifth Circuit.  That case raises some of the same challenges to DACA as presented here, but those challenges were not decided on the merits.

extension of deferred action to parents of DACA recipients is not lawful.

On Page 32, the OLC Memorandum states that:

> But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law.
>
>       \* \* \*
>
> Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.
>
>       \* \* \*
>
> The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.
>
> For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs.
>
>       \* \* \*
>
> But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

## 11. Defendants' New Rules are Arbitrary, Capricious, and Unreasonable

To the extent that the Defendants are changing the interpretation, application, and treatment of this subject matter under existing law and regulations, the departure from past practice renders the Defendants actions now necessarily arbitrary, capricious, and inherently

unreasonable.  That is, where the agency's specialized expertise has in the past led to one result.

But now the Defendants choose a contrary result, both results cannot be simultaneously justified

by the same facts and circumstances as informed by the agency's experience and expertise.

While the Federal courts may defer to the agency's application of the law under certain

specific conditions, a dramatic departure from past interpretation and application cannot be a

product of the agency's experience and expertise.

What has changed to justify this dramatic departure from past practice?  Not the facts, nor

the circumstances or the agency's experience.  What has changed is President Obama's overtly

announced desire to force Congress to change the national policies on immigration and

naturalization and to subvert Congress' refusal to do so.

As the U.S. Supreme Court recently illustrated with regard to regulation of greenhouse

gases from certain types of sources, a Federal Department "must ground its reasons for action or

inaction in the statute."  Here, however, the Defendants clearly ground their reasons for acting in

politics and lobbying Congress to pass the legislation they desire, not in the statute.

> In short, EPA has offered no reasoned explanation for its refusal to decide
> whether greenhouse gases cause or contribute to climate change. Its action
> was therefore arbitrary, capricious, . . . or otherwise not in accordance
> with law. 42 U. S. C. §7607(d)(9)(A). We need not and do not reach the
> question whether on remand EPA must make an endangerment finding, or
> whether policy concerns can inform EPA.s actions in the event that it
> makes such a finding. Cf. *Chevron U. S. A. Inc.* v. *Natural Resources
> Defense Council, Inc.*, 467 U. S. 837, 843-844 (1984). We hold only that
> EPA must ground its reasons for action or inaction in the statute.

*Massachusetts v. Environmental Protection Agency*, 549 U.S. 497(2007).

The U.S. Supreme Court reversed in part because the agency action "was therefore

arbitrary, capricious, . . . or otherwise not in accordance with law."  Here, for the Department to

adopt a different approach than the previously justified under the law, the facts, circumstances,

and agency expertise – when there has been no change of circumstances other than a different President with a different set of policy goals – is by its very nature of a dramatic change in direction Its action "arbitrary, capricious, . . . or otherwise not in accordance with law."

**12. Defendants Admit their Goals are Political, Not Prosecutorial Discretion**

Another factor demonstrating that the Defendants are legislating by their executive action programs is that the Defendants openly admit their objective for the program is political, that is to make a dramatic change in the Nation's policies on immigration and naturalization.  President Obama has made it unmistakably clear in dozens of public statements that he seeks to determine the national policy on immigration and naturalization while the U.S. Constitution explicitly reserves only to the Congress the power to set uniform rules on naturalization.

As demonstrated by the news reports attached collectively as Exhibit I, President Obama has made unmistakably clear in public statements intended to be official pronouncements of his position and policy that:

a)  The objective of these programs is to establish a new national policy different from the policies enacted into law by Congress.

b)  President Obama is ordering these actions explicitly to circumvent Congress.

c)  President Obama is ordering these actions explicitly because Congress did not pass legislation that he favors.  That is, Obama is aware that his actions are in conflict with the will of Congress and Obama is acting precisely because his actions are in conflict with the will of Congress.

d)  President Obama is offering to withdraw these executive action programs if Congress passes the legislation that Obama wants, including with the content he wants. Thus the Defendants' programs are not grounded in facts, circumstances, or the expertise of the

government but in a desire to coerce the Congress.  The fact that Obama offers to withdraw the programs indicate that they are not a sincere determination of appropriate considerations.

**13. <u>Divided Congress Unlikely to Act</u>**

Meanwhile, it appears that the Republican Party in Congress remains divided and unlikely to act to block or defund the Defendants' executive action programs.  *See* "Obama Has Already Won the Immigration Fight," Dana Milbank, <u>The Washington Post</u>, December 2, 2014, attached as Exhibit J, and "The GOP's War on Obama's Executive Action Lasted About 5 Minutes," Sahil Kapur, <u>The Talking Points Memo: DC</u>, December 3, 2014, attached as Exhibit K.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiff's motion and enter a preliminary injunction that, during the pendency of this suit, orders Defendants to cease and desist and not initiate the plans for executive action directed by the President.  In addition and in so doing, this Court should declare Defendants' actions unconstitutional.


Dated: December 4, 2014


Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

*Attorney for Plaintiff*