**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSEPH ARPAIO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 14-cv-1966 (BAH) |
| | ) | |
| BARACK OBAMA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

I.    Statutory and Regulatory Background..............................................................4

     A.    The Executive Branch's Discretion Over Immigration Enforcement.....................4

     B.    The Executive Branch's Longstanding Exercise Of Its Immigration Enforcement Discretion Through "Deferred Action."............................................5

II.   Procedural Background...................................................................................9

     A.    DHS Guidance Challenged by Plaintiff ..................................................9

          i.    2012 Deferred Action For Childhood Arrivals...........................................9

          ii.    2014 DACA Modification ..................................................................10

          iii.    2014 Deferred Action For Parents of U.S. Citizens and LPRs.................11

     B.    Plaintiff's Claims ................................................................................12

STANDARD OF REVIEW ...................................................................................13

ARGUMENT ........................................................................................................14

I.    THE COURT SHOULD DENY PLAINTIFF'S MOTION AND DISMISS THIS ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFF LACKS STANDING...................................................14

     A.    Plaintiff Lacks Article III Standing to Challenge the Deferred Action Guidance At Issue In This Case...............................................14

          i.    Plaintiff Has Failed to Demonstrate Any Injury-In-Fact Traceable to the Specific Guidance He Challenges In This Litigation............................................................................................15

          ii.    Plaintiff's Purported Injury Is Not Redressable By The Relief Sought Or Any Relief Plaintiff Could Plausibly Secure In This Litigation...................................................................................20

     B.    Prudential Considerations Further Undermine This Court's Authority To Review This Challenge......................................................................20

i

II.     PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM ABSENT A
        PRELIMINARY INJUNCTION ........................................................................22

III.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.................................24

        A.      Deferred Action Is An Unreviewable Exercise of Enforcement
                Discretion Under *Heckler v. Chaney* .......................................................24

                i.      Congress Has Not Limited DHS's Exercise of Discretion Through
                        Deferred Action .........................................................................26

                ii.     DHS Has Not Stated A "Belief That It Lacks Jurisdiction." ....................30

                iii.    DHS's Tailored Deferred Action Guidance Do Not Constitute "An
                        Abdication of" DHS's "Statutory Responsibilities."................................30

        B.      Plaintiff's APA Claims Lack Merit ........................................................33

                i.      As a Procedural Matter, The Deferred Action Guidance Is
                        Explicitly Exempt From the Notice-And-Comment Requirement
                        Of The APA ..............................................................................33

                ii.     The Deferred Action Guidance Fully Complies With The APA..............35

                iii.    DHS's Guidance Memoranda Discussing Proposed Regulations Do Not
                        Constitute Final Agency Action....................................................37

        C.      Plaintiff's Non-Delegation Claim Also Lacks Merit ............................................39

IV.     GRANTING A PRELIMINARY INJUNCTION WOULD HARM
        DEFENDANTS AND THE PUBLIC INTEREST...........................................................39

        A.      The Challenged Deferred Action Policies Promote Congressionally-
                Mandated Public Safety And National Security Objectives ..................................40

        B.      The Challenged Deferred Action Guidance Advances Other
                Immigration Policy Objectives ..............................................................42

        C.      Enjoining the Challenged Deferred Action Guidance Would
                Significantly Undermine The Public Interest ........................................................43

        D.      The Challenged Deferred Action Guidance and Exercises of Discretion
                Can Be Modified At Any Time ...........................................................44

CONCLUSION.................................................................................................................44

# TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ............................................................................ 14, 24

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) .................................................................................. 13

*Adams v. Richardson*,
  480 F.2d 1159 (D.C. Cir. 1973) ........................................................................... 30, 31

*Am. Trucking Ass'n, Inc., v. U.S. Envtl. Prot. Agency*,
  175 F.3d 1027 (D.C. Cir 1999) ................................................................................. 39

*Arizona v. United States*,
  132 S. Ct. 2492 (2012) ....................................................................................... passim

*Ass'n of Civilian Technicians, Inc. v. FLRA*,
  283 F.3d 339 (D.C. Cir. 2002) .................................................................................. 31

*Ass'n of Irritated Residents v. E.P.A.*,
  494 F.3d 1027 (D.C. Cir. 2007) ................................................................................ 29

*Balt.Gas & Elec. Co. v. F.E.R.C.*,
  252 F.3d 456 (D.C. Cir. 2001) ........................................................................ 24, 26, 30

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 20, 21, 33, 38

*Brown v. Dist. of Columbia*,
  888 F. Supp. 2d 28 (D.D.C. 2012) ............................................................................. 23

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) .................................................................................. 39

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 13, 22, 23

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ................................................................................................... 34

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) .............................................................................................. 18

*Claybrook v. Slater,*
111 F.3d 904 (D.C. Cir. 1997) ............................................................. 27

*Crane v. Napolitano,*
920 F. Supp. 2d 724 (N.D. Tex. 2013) .................................................. 16

*Crow Creek Sioux Tribe v. Brownlee,*
331 F.3d 912 (D.C. Cir. 2003) ............................................................. 14

*Cutler v. Hayes,*
818 F.2d 879 (D.C. Cir. 1987) ....................................................... 30, 31

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ............................................................................ 14

*Fed'n for Am. Immigration Reform v. Reno,*
93 F.3d 897 (D.C. Cir. 1996) ............................................................... 21

*Fla. Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) ............................................................... 16

*Fook Hong Mak v. INS,*
435 F.2d 728 (2d Cir. 1970) ................................................................ 35

*Fraternal Order of the Police v. United States,*
152 F.3d 998 (D.C. Cir. 1998) ............................................................. 16

*Fund for Animals v. Frizzell,*
530 F.2d 982 (D.C. Cir. 1975) ............................................................. 23

*Gulf Oil Corp. v. FEA,*
391 F. Supp. 856 (W.D. Pa. 1975) ....................................................... 44

*Heckler v. Chaney,*
470 U.S. 821 (1985) .................................................. 2, 24, 25, 29

*Hodges v. Abraham,*
253 F. Supp. 2d 846 (D.S.C. 2002) ...................................................... 44

*Holistic Candlers and Consumers Ass'n v. FDA,*
664 F.3d 940 (D.C. Cir. 2012) ............................................................. 39

*INS v. Chadha,*
462 U.S. 919 (1983) ............................................................................ 35

*INS v. Errico,*
385 U.S. 214 (1966) ............................................................................ 28

iv

*Knauff v. Shaughnessy,*
   338 U.S. 537 (1950) ................................................................................ 4

*Lamont v. O'Neill,*
   285 F.3d 9 (D.C. Cir. 2002)................................................................... 16

*Lance v. Coffman,*
   549 U.S. 437 (2007) ............................................................................. 20

*Lexmark International, Inc. v. Static Control Components, Inc.,*
   134 S. Ct. 1377 (2014).......................................................................... 21

*\*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ............................................................................. 34

*Linda R. S. v. Richard D.,*
   410 U.S. 614 (1973) ............................................................................. 15

*\*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ..................................................................... passim

*Mada-Luna v. Fitzpatrick,*
   813 F.2d 1006 (9th Cir. 1987)............................................................... 35

*Mathews v. Diaz,,*
   426 U.S. 57 (1976) ............................................................................... 21

*Mills v. Dist. of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009)............................................................. 23

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................................................................. 39

*Mova. Pharm. Corp. v. Shalala,*
   140 F.3d 1060 (D.C. Cir. 1998)............................................................. 40

*Munaf v. Geren,*
   553 U.S. 674 (2008) ............................................................................. 14

*Nat'l Res. Def. Coun., Inc. v. Pena,*
   972 F. Supp. 9 (D.D.C. 1997)............................................................... 43

*Newdow v. Bush,*
   355 F. Supp. 2d 265 (D.D.C. 2005)....................................................... 23

*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004) ............................................................................... 37

*People of Colo. ex rel. Suthers v. Gonzales*,
558 F. Supp. 2d 1158 (D. Colo. 2007) ...................................................................... 16

*Perales v. Casillas*,
903 F.2d 1043 (5th Cir. 1990) ................................................................................ 36

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
489 F.3d 1267 (D.C. Cir. 2007) .............................................................................. 16

*\*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ......................................................................... 7, 8, 26, 29

*Sadowski v. Bush*,
293 F. Supp. 2d 15 (D.D.C. 2003) ........................................................................... 16

*Sec'y of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (2006) ............................................................................................. 24

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .............................................................................. 24

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011) .............................................................................. 27

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ............................................................................................... 14

*Sweis v. U.S. Foreign Claims Settlement Comm'n*,
950 F. Supp. 2d 44 (D.D.C. 2013) .......................................................................... 24

*Texas v. United States*, No. B-94-228 (S.D. Tex. Aug. 7, 1995) ......................................... 17, 31

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ............................................................................................. 25

*United States ex. rel. Parco v. Morris*,
426 F. Supp. 976 (E.D. Pa. 1977) ............................................................................. 6

*United States v. 9/1 Kg. Containers*,
854 F.2d 173 (7th Cir. 1988) ................................................................................ 29

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) ............................................................................................. 21

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................................. 20

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) ................................................................................. 40

*Webster v. Doe*,
  486 U.S. 592 (1988) ................................................................................................. 27

*Whitaker v. Thompson*,
  248 F. Supp. 2d 1 (D.D.C. 2002) ............................................................................. 40

*White Stallion Energy Ctr., LLC v. E.P.A.*,
  748 F.3d 1222 (D.C. Cir. 2014) ............................................................................... 36

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ................................................................................................. 39

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ..................................................................................................... 13

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................. 22

*Zukerberg v. D.C. Bd. of Elections & Ethics*,
  999 F. Supp. 2d 79 (D.D.C. 2013) ........................................................................... 14

## STATUTES

5 U.S.C. § 706(1) ............................................................................................................. 37
5 U.S.C. § 553(b)(3)(A) ............................................................................................ 34, 35
5 U.S.C. § 704 ........................................................................................................... 33, 38
5 U.S.C. § 706(2)(A) ...................................................................................................... 33
5 U.S.C. § 706(2)(C) ...................................................................................................... 33
5 U.S.C. § 706(2)(D) ...................................................................................................... 33
6 U.S.C. § 202(5) ...................................................................................................... 4, 35
8 U.S.C. § 1103 ....................................................................................................... 35, 39
8 U.S.C. § 1103(a) .......................................................................................................... 27
8 U.S.C. § 1103(a)(1) ....................................................................................................... 4
8 U.S.C. § 1103(a)(3) .............................................................................................. 4, 27, 39
8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) ............................................................................... 8
8 U.S.C. § 1158(c)(1)(B) ................................................................................................ 37
8 U.S.C. § 1182 .............................................................................................................. 27
8 U.S.C. § 1182(a)(6)(C)(ii)(II) ...................................................................................... 28
8 U.S.C. § 1225(c) ..................................................................................................... 5, 27
8 U.S.C. § 1226(a) ............................................................................................................ 5
8 U.S.C. § 1226(a)(3) ...................................................................................................... 37
8 U.S.C. § 1226(c) ............................................................................................................ 5
8 U.S.C. § 1227(d)(2) ....................................................................................................... 8
8 U.S.C. § 1252(g) ............................................................................................................ 8

8 U.S.C. § 1324a(h)(3) ................................................................................ 6, 12, 36, 39

Consolidated Appropriations Act, 2014
  2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat. 5, 251 (2014) ................................ 5, 27, 32

DHS Appropriations Act 2010,
  Pub. L. No. 111-83, 123 Stat. 2142 (2009) ................................................................. 5

Homeland Security Act of 2002,
  Pub. L. No. 107-296, § 402(5), 116 Stat. 2135 ................................................................. 4

National Defense Authorization Act for Fiscal Year 2004,
  Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392 ................................................................. 9

REAL ID Act of 2005,
  Pub. L. No. 109-13, Div. B, 119 Stat. 231 ................................................................. 8

USA PATRIOT Act of 2001,
  Pub. L. No. 107-56, § 423(b), 115 Stat. 272 ................................................................. 9

Victims of Trafficking and Violence Protection Act of 2000,
  Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464 ................................................................. 8

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
  Pub. L. No. 110-457, § 204, 122 Stat. 5044 ................................................................. 8

**UNITED STATES CONSTITUTION**

U.S. Const., art. II, § 3 ................................................................................ 25

**REGULATIONS**

8 C.F.R. § 2.1 ................................................................................ 27
8 C.F.R. § 274a.12 ................................................................................ 36
8 C.F.R. § 274a.12(c)(14) ................................................................................ 6, 12
8 C.F.R. 242.5 ................................................................................ 6
*Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses,*
  43 Fed. Reg. 2776, 2776 (Jan. 19, 1978) ................................................................. 6

**LEGISLATIVE MATERIAL**

H.R. Rep. No. 111-157 (2009) ................................................................................ 5, 33
H.R. Rep. No. 85-1199 (1957) ................................................................................ 28

## INDEX OF EXHIBITS

**DOCUMENT**                                                                                    **EXHIBIT**

Karl Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the          1
Counsel to the President: *DHS's Authority to Prioritize Removal of Certain Aliens
Unlawfully Present in the United States and to Defer Removal of Others,* (Nov. 19, 2014)

Memorandum from Jeh Charles Johnson, Secretary, DHS to Thomas S. Winkowski,            2
Acting Director, U.S. Immigration and Customs Enforcement, et. al., *Policies for the
Apprehension, Detention and Removal of Undocumented Immigrants* (November 20, 2014)

USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for            3
Community Partners* (2014)

Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS              4
Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who
Came to the United States as Children* at 20-23 (July 13, 2012)

Moore, Charlotte J., Cong. Research Serv., Review of U.S. Refugee Resettlement          5
Programs and Policies at 9, 12-14 (1980)

Memorandum from Gene McNary, Commissioner, INS, to Regional Commissioners, INS,        6
*Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the
Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)

Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to       7
Regional Directors et al., INS, *Supplemental Guidance on Battered Alien Self-Petitioning
Process and Related Issues* at 3 (May 6, 1997)

Memorandum from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to    8
Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and
Violence Protection Act of 2000 Policy Memorandum #2 – "T" and "U" Nonimmigrant
Visas* at 2 (Aug. 30, 2001)

USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by      9
Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005)

Memorandum from Donald Neufeld, Acting Associate Director, USCIS, to Field             10
Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and
Their Children* at 1 (Sept. 4, 2009)

Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting          11
Commissioner, CPB, et al, *Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children* at 1 (June 15, 2012)

Sam Bernsen, Immigration and Naturalization Serv. (INS) General Counsel, Legal Op.    12
Regarding Service Exercise of Prosecutorial Discretion 2 (July 15, 1976)

Memorandum from Doris Meissner, INS Comm'r, to Regional Directors, *Exercising*    13
*Prosecutorial Discretion* at 2 (Nov. 17, 2000)

Memorandum from William J. Howard, Principal Legal Advisor, DHS, to OPLA Chief    14
Council, DHS, *Prosecutorial Discretion* (Oct. 24, 2005)

Memorandum from Julie L. Myers, Assistant Sec'y, DHS, to Field Office Directors, DHS,    15
*Prosecutorial and Custody Discretion* (Nov. 7, 2007)

Memorandum from Jeh Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS,    16
et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the*
*United States as Children and with Respect to Certain Individuals Who Are the Parents*
*of U.S. Citizens or Permanent Residents* (November 20, 2014)

Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director,    17
USCIS, *Expansion of the Provisional Waiver Program* (November 20, 2014)

Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director,    18
USCIS, et. al., *Policies Supporting U.S. High Skilled Businesses and Workers* (November
20, 2014)

*Texas v. United States*, No. B-94-228 (S.D. Tex. Aug. 7, 1995)    19

Dangerous Passage: Central America in Crisis and the Exodus of Unaccompanied Minors:    20
Hearing Before the S. Foreign Relations Comm. (July 17, 2014) (Testimony of Ambassador
Thomas A. Shannon, Counselor of the Department of State)

Challenges at the Border: Examining the Causes, Consequences, and Responses to the    21
Rise in Apprehensions at the Southern Border: Hearing Before the S. Comm. on Homeland
Security and Governmental Affairs at 4 (July 9, 2014) (statement of Craig Fugate,
Administrator, Federal Emergency Management Agency, et al.)

Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected,    22
Approvals, and Denials (2014)

U.S. Customs and Border Protection, *USBP Nationwide Apprehensions by Requested*    23
*Citizenship FY 2010 – FY 2014* (2014)

Statement of Jeh C. Johnson, Secretary, U.S. Dep't of Homeland Security, Hearing on    24
Open Borders: The Impact of Presidential Amnesty on Border Security, U.S. House Comm.
on Homeland Security, 113th Cong. 3-4 (Dec. 2, 2014)

# INTRODUCTION

The policies at issue in this case are part of a comprehensive effort by the Secretary of Homeland Security, at the request of the President, to more effectively administer and enforce our nation's immigration laws.  The effort reflects the multiple, converging enforcement challenges that the Department of Homeland Security ("DHS") has faced in recent years.  These challenges include:  insufficient resources to address the number of immigration violations confronted by the Department; recent demographic shifts at the border that significantly increase the costs of managing and deterring unauthorized border crossings; the increasing complexity of removing aliens from the interior; congressional directives to prioritize recent border crossers and aliens convicted of serious crimes; the humanitarian and social consequences of separating the nuclear families of U.S. citizens and lawful permanent residents ("LPRs"); and renewed urgency to harmonize the work of DHS's component immigration agencies.

On November 20, 2014, the Secretary issued a series of directives pursuant to his authority under the Immigration and Nationality Act ("INA") to address these challenges. Central to this initiative is the establishment of DHS-wide enforcement priorities that further emphasize national security, border security, and public safety.  These priorities reflect statutory obligations and congressional priorities embodied in the INA, as well as humanitarian factors recognized by our immigration laws.  They also reflect DHS's need to prioritize and better coordinate its enforcement efforts in light of its limited resources.  Integral to this initiative is a DHS memorandum calling for the case-by-case exercise of deferred action—a long-established form of prosecutorial discretion—for certain low-priority aliens:  aliens present in the United States since before 2010 and who either entered as children or are the parents of U.S. citizens or LPRs.  Designation of such aliens as potentially eligible for deferred action serves two purposes: (1) to enhance DHS's capacity to focus limited resources on threats to national security, border

security, and public safety, and (2) to recognize family ties and other humanitarian concerns under the INA.

Hours after the President's announcement of the Secretary's new initiative, Plaintiff filed the instant lawsuit, challenging parts of the DHS initiative, as well as DHS deferred action guidance that has been in effect since 2012.  Plaintiff is a county sheriff, challenging a national policy in a domain that the Supreme Court has made clear is an area of federal authority, and that does not impose any constraint or obligation on his office.  Plaintiff's claimed harm is that deferred action serves as a magnet for more illegal entries by aliens who will then commit crimes within his county and thus burden his law enforcement resources.  This theory is speculative and unsubstantiated; indeed, it is contradicted by the very guidance he challenges, which aims to provide federal authorities increased resources to remove criminal aliens and recent border crossers—precisely the individuals whom Plaintiff argues should be removed.  Plaintiff has thus failed to show he will suffer any Article III injury at all—irreparable or otherwise—let alone an injury traceable to the guidance at issue or redressable by any relief that this Court could order.

Nor can Plaintiff demonstrate the requisite likelihood of success on the merits.  First, his lack of standing, in addition to being a reason for dismissal, is fatal to his success on the merits.  Second, even if he had standing, Plaintiff's challenge to the prosecutorial discretion embodied in the DHS guidance is meritless.  Indeed, the Supreme Court has made clear that the federal government's discretion regarding immigration enforcement includes decisions whether to even pursue removal.  *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012).  The DHS policy guidance at issue here, concerning its prioritization of immigration enforcement efforts, is inherently a matter committed to agency discretion by law, which this Court lacks authority to review.  *See Heckler v. Chaney*, 470 U.S. 821 (1985).

2

Plaintiff's repeated false labeling of deferred action as "amnesty" merely belies the weakness of his arguments.  The deferred action guidance does not grant legal status to any alien.  Rather, it authorizes a temporary exercise of prosecutorial discretion on a case-by-case basis for certain individuals who have been in the United States since 2010 and have deep ties to the community, while making work authorization available under existing statutory authority.  This guidance is part of a long tradition of the exercise of prosecutorial discretion, and in particular , the use of deferred action, to advance federal immigration priorities.  Indeed, Congress itself recognizes that the Executive must prioritize its resources in this area, and has instructed DHS to prioritize the removal of criminals and recent border crossers, as it is doing here.  This specific direction, against the historical backdrop of broad discretion afforded the Secretary of Homeland Security, makes clear that Plaintiff's substantive challenge is meritless.

Finally, the balance of harms and public interest weigh heavily against granting a preliminary injunction to prohibit the existing and future use of deferred action for certain childhood arrivals and certain parents of U.S. citizens or LPRs who have been in the country since 2010.  Among other things, the requested preliminary injunction would subvert the government's judgment about how best to protect border security, national security, and public safety, including by focusing on the removal of priority aliens.  An injunction would also interfere with the Secretary's established authority to take into account humanitarian consequences in exercising his power to consider deferred action.  Furthermore, an injunction would do nothing to advance the claimed interests of Plaintiff, which, if anything, are advanced by the very guidance he seeks to challenge.

For all of these reasons, Plaintiff's motion should be denied, and this case should be dismissed for lack of jurisdiction.

## BACKGROUND

I.    **Statutory and Regulatory Background.**

A.  **The Executive Branch's Discretion Over Immigration Enforcement.**

Congress has charged the Secretary of Homeland Security with the administration and enforcement of the immigration laws.  8 U.S.C. § 1103(a)(1).  In doing so, it has vested the Secretary with considerable discretion over immigration matters, authorizing the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute.  *Id.* § 1103(a)(3) (emphasis added).  Such broad authority and discretion over immigration matters is consistent with the Executive Branch's inherent power over the admissibility and exclusion of aliens.  *See Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950).  This power is at its apex when the removal of aliens is at issue.  "The broad discretion exercised by immigration officials" is a "principal feature of the removal system," which includes the power to decide "whether it makes sense to pursue removal at all."  *Arizona*, 132 S. Ct. at  2499.

Recognizing the Executive Branch's inherent power and need for flexibility in light of limited resources for immigration enforcement, Congress has directed the Secretary to establish "national immigration enforcement policies and priorities."  Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).  Indeed, although there "are approximately 11.3 million undocumented aliens in the country," Congress has only "appropriated sufficient resources for [DHS] to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country."  Karl Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 9

(Nov. 19, 2014) ("OLC Op.").[1]  These significant constraints require DHS to "ensure that [its] limited resources [are] devoted to the pursuit of" its highest priorities.  *Id.*  (quoting draft of Memorandum from Jeh Charles Johnson, Secretary, DHS, to Thomas S. Winkowski, Acting Director, U.S. Immigration and Customs Enforcement, *et al.*, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014) ("Prioritization Guidance") (attached as Exhibit 2).

This prioritization is reflected in the immigration laws.  The INA, for example, prioritizes the detention and removal of recent border crossers, criminal aliens, and threats to national security.  *See*, *e.g.*, 8 U.S.C. § 1225(establishing a special "expedited removal" process for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for aliens convicted of certain crimes); *id.* § 1226a (providing mandatory detention of suspected terrorists).  Congress has also directed DHS to prioritize "the identification and removal of aliens convicted of a crime," Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat. 5, 251 (2014), and to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer," H.R. Rep. No. 111-157, at 8 (2009) (DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009) (enacted as amended)).

### B.  The Executive Branch's Longstanding Exercise Of Its Immigration Enforcement Discretion Through "Deferred Action."

The Executive Branch has long exercised prosecutorial discretion in the immigration context, including through "deferred action" with respect to certain classes of aliens, in order to focus the agency's scarce resources on higher priority aliens.  Deferred action also can further

---

[1] The OLC Opinion is attached as Exhibit 1.  It is also publicly available at: http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf.

other public interests, such as offering humanitarian relief, advancing foreign policy objectives,

fostering economic development, and promoting administrative efficiency.  Deferred action is

revocable at any time and *does not* confer legal status on aliens whose removal is deferred.  *See*,

*e.g.*, U.S. Citizenship and Immigration Services ("USCIS"), *Deferred Action for Childhood*

*Arrivals (DACA) Toolkit: Resources for Community Partners* at 16 (2014) ("DACA Toolkit")

(attached as Exhibit 3).  Longstanding regulations, based on authority granted to the Secretary

and previously to the Attorney General, *see* 8 U.S.C. § 1324a(h)(3), provide that an alien subject

to deferred action may be eligible for employment authorization.  8 C.F.R. § 274a.12(c)(14).

     For decades, the Executive Branch has implemented deferred action and other forms of

prosecutorial discretion both for individual aliens and for various classes of aliens.  For example,

from 1956 to 1990, discretionary mechanisms similar to deferred action were used to defer

enforcement against aliens who were beneficiaries of approved visa petitions,[2] nurses who were

eligible for H-1 visas,[3] nationals of designated foreign states,[4] and the ineligible spouses and

children of aliens who had been granted legal status under the Immigration Reform and Control

Act of 1986.[5]  *See* OLC Op. at 14.  Since 1990, deferred action has been applied for additional

---

[2] *See United States ex. rel. Parco v. Morris*, 426 F. Supp. 976, 979-80 (E.D. Pa. 1977).

[3] *See* Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978).

[4] *See* Andorra Bruno *et al.*, Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23 (July 13, 2012) (attached as Exhibit 4); Moore, Charlotte J., Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12-14 (1980) (excerpt attached as Exhibit 5).

[5] Memorandum from Gene McNary, Commissioner, INS, to Regional Commissioners, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) (attached as Exhibit 6).

classes of aliens, such as battered aliens under the Violence Against Women Act ("VAWA"),[6] T

and U Visa applicants,[7] foreign students affected by Hurricane Katrina,[8] widows and widowers

of U.S. citizens,[9] and childhood arrivals.[10]  *See id.* at 15-17.[11]

The Supreme Court has specifically acknowledged the Executive Branch's authority to

exercise prosecutorial discretion in the immigration context, including through deferred action.

*See Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 483-84 (1999)

("At each stage [of the removal process] the Executive has discretion to abandon the endeavor,

---

[6] Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to Regional Directors *et al.*, INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997) (attached as Exhibit 7).

[7] Memorandum from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001) (attached as Exhibit 8).

[8] USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005) (attached as Exhibit 9).

[9] Memorandum, from Donald Neufeld, Acting Associate Director, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009) (attached as Exhibit 10).

[10] Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, CBP, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("2012 DACA Memo") (attached as Exhibit 11).

[11] *See also* Sam Bernsen, Immigration and Naturalization Serv. (INS) General Counsel, Legal Op. Regarding Service Exercise of Prosecutorial Discretion 2 (July 15, 1976) (attached as Exhibit 12) (noting the Executive Branch's "inherent authority" to exercise prosecutorial discretion); Memorandum from Doris Meissner, INS Comm'r, to Regional Directors, *Exercising Prosecutorial Discretion* at 2 (Nov. 17, 2000) (attached as Exhibit 13) (directing, following the enactment of IIRIRA, that prosecutorial discretion "applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions," such as  "granting deferred action or staying a final order"); Memorandum from William J. Howard, Principal Legal Advisor, DHS, to OPLA Chief Council, DHS, *Prosecutorial Discretion* at 2 (Oct. 24, 2005) (attached as Exhibit 14) (recognizing, after the formation of DHS that the "universe of opportunities to exercise prosecutorial discretion is large," including "in the pre-filing stage, when, for example, we can advise clients who consult us whether or not to file NTAs"); Memorandum from Julie L. Myers, Assistant Sec'y, DHS, to Field Office Directors, DHS, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) (attached as Exhibit 15) (recommending the exercise of prosecutorial discretion for nursing mothers).

and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."). Moreover, the Court has recognized that 8 U.S.C. § 1252(g) renders the Executive's exercise of discretion over the initiation and prosecution of removal proceedings unreviewable. *Id.* at 483-84, 486-87. The Supreme Court recently reaffirmed the Executive Branch's authority to defer the initiation of removal proceedings. *See Arizona*, 132 S. Ct. at 2499 ("Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

Congress also has approved the practice of deferred action. For example, Congress expanded the Executive's VAWA deferred action program in 2000 by making eligible for "deferred action and work authorization" children who could no longer self-petition under VAWA because they were over the age of 21. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)). Similarly, in 2008, as part of legislation authorizing DHS to grant "an administrative stay of a final order of removal" to any individual who could make a *prima facie* showing of eligibility for a T or U visa, Congress stated that "[t]he denial of a request for an administrative stay of removal . . . shall not preclude the alien from applying for . . . deferred action." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(2)). In addition, in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302, Congress specified that "approved deferred action status" constituted evidence of lawful status as it relates to making state-issued driver's licenses or identification cards acceptable for federal purposes. Congress also has specified classes of aliens who should be made eligible for deferred action,

such as certain family members of LPRs who were killed on September 11, 2001, *see* USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain family members of certain U.S. citizens killed in combat, *see* National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694.

## II.   Procedural Background.

### A.  DHS Guidance Challenged by Plaintiff.

#### i.   2012 Deferred Action For Childhood Arrivals.

On June 15, 2012, DHS announced guidance referred to as Deferred Action for Childhood Arrivals ("DACA").  Under DACA, aliens brought to the United States as children who meet certain guidelines, including continuous residence in the United States since June 15, 2007, are able to request deferred action.[12]  *See* Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, CBP, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("2012 DACA Memo") (attached as Exhibit 11).  The 2012 DACA Memo explained that deferred action would be offered "in the exercise of [DHS's] prosecutorial discretion" because these children "lacked the intent to violate the law" and "additional measures [were] necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities." *Id.*

---

[12] The DACA guidelines are: (1) being under the age of 31 when the guidance was issued; (2) being under the age of 16 at the time of arrival in the United States; (3) having continuously resided in the United States for at least five years immediately preceding June 15, 2012; (4) having been physically present in the United States on June 15, 2012; (5) being in school, having graduated from high school, having obtained a general education development certificate, or having been honorably discharged from the Coast Guard or the Armed Forces of the United States; (6) and not having been convicted of felonies or other serious offenses, or otherwise posing a threat to the national security or public safety.  2012 DACA Memo at 1.

DHS officials consider approval for DACA "on an individual basis," and contingent on meeting the eligibility guidelines, passing a background check, and otherwise meriting an exercise of discretion. *Id*. at 2. The 2012 DACA Memo made clear that DHS could not "provide any assurance that relief w[ould] be granted in all cases," *id*., and that deferred action "confer[red] no substantive right, immigration status or pathway to citizenship." *Id.* at 3. Successful DACA requestors received deferred action for two years, subject to renewal. DACA Toolkit at 11. Those who receive DACA are also eligible for work authorization during the period of deferred action. *See* 2012 DACA Memo at 3. A grant of deferred action under DACA can be terminated at any time in the agency's discretion. DACA Toolkit at 16.

### ii.  2014 DACA Modification.

On November 20, 2014, the Secretary issued various memoranda as part of a comprehensive initiative to establish Department-wide enforcement priorities that further focus DHS resources on national security, border security, and public safety. One of those memoranda addressed deferred action guidelines for low-priority aliens and included revisions to three aspects of DACA. *See* Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ("2014 Deferred Action Guidance")  (attached as Exhibit 16). First, it removed the age cap of 31 so that individuals could request DACA regardless of their current age, as long as they entered the United States before the age of 16. *Id*. at 3. Second, it extended the period of DACA from two to three years. *Id*. Third, it adjusted the relevant date by which an individual must have been in the United States from June 15, 2007 to January 1, 2010. *Id*. at 4. USCIS was instructed to

begin accepting requests under the revised DACA guidelines no later than 90 days after the guidance was issued, *id.*, which is February 18, 2015.

### iii.   2014 Deferred Action For Parents of U.S. Citizens and LPRs.

The November 2014 Deferred Action Guidance also established separate guidelines under which certain parents of U.S. citizens or LPRs will be able to request deferred action ("DAPA").  To be considered for deferred action under DAPA, an individual must meet the following guidelines:  (1) have, on November 20, 2014, a son or daughter who is a U.S. citizen or LPR; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014, and at the time of making a request for deferred action with USCIS; (4) have had no lawful status on November 20, 2014; (5) not fall within one of the categories of enforcement priorities set forth in another memorandum issued that same day; and (6) present no other factors that, in the exercise of discretion, make the grant of deferred action inappropriate.  2014 Deferred Action Guidance at 4.  In addition, individuals are required to submit personal identifying information, such as fingerprints, to USCIS for a background check.  *Id.*  USCIS was instructed to begin accepting requests from individuals under the DAPA guidelines no later than 180 days after the policy's announcement, *id.* at 5, which is May 19, 2015.

As with DACA, DAPA requests will be assessed individually by immigration officers, who will determine whether to exercise prosecutorial discretion "on a case-by-case basis" considering all relevant factors.  *Id.* at 4.  Also, as with DACA, deferred action under DAPA does not confer any "substantive right, immigration status or pathway to citizenship," *id.* at 5, and it may be revoked at any time in the agency's discretion, *id.* at 2.  Individuals who request deferred action under DAPA may also be eligible for work authorization for the period of

deferred action (3 years) pursuant to applicable regulations.  *Id.* at 4-5; 8 U.S.C. § 1324a(h)(3); 8

C.F.R. § 274a.12(c)(14).[13]

### B.  Plaintiff's Claims.

On November 20, 2014, the same day that the 2014 Deferred Action Guidance and other

immigration guidance memoranda were issued, Plaintiff Joseph Arpaio, the Sheriff of Maricopa

County in Arizona, filed a Complaint against Defendants seeking declaratory and injunctive

relief (Compl.) (ECF. No. 1).  Plaintiff challenges DHS's authority concerning the ongoing

implementation of DACA, which has been taking place since 2012, as well as DHS's authority

to issue some of the DHS guidance announced on November 20, 2014, although he fails to

differentiate clearly among the several DHS memoranda issued that day.  Plaintiff's Complaint

includes six causes of action, of which four (the first, third, fourth, and fifth) all concern one

issue:  whether DHS has the authority to implement DACA and the 2014 Deferred Action

Guidance.[14]  Plaintiff appears to argue that DACA and other 2014 DHS guidance: (1) exceeded

the Executive Branch's constitutional and statutory authority (first, third, fourth, and fifth causes

of action); (2) were subject to, and violated, the Administrative Procedure Act's ("APA") notice-

---

[13] In his Motion, Plaintiff references three other memoranda issued by DHS on November 20,
2014.  *See* Prioritization Guidance (attached as Exhibit 2); Memorandum from Jeh Charles
Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS,*et al.*, *Expansion of the
Provisional Waiver Program* (Nov. 20, 2014) ("Provisional Waiver Guidance") (attached as
Exhibit 17); Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez,
Director, USCIS, *et al.*, *Policies Supporting U.S. High Skilled Businesses and Workers* (Nov. 20,
2014) ("High-Skilled Businesses & Workers Guidance") (attached as Exhibit 18).

[14] Plaintiff alleges that DACA, and some of DHS's 2014 guidance memoranda, exceed the
President's authority under the Constitution (first cause of action), Compl. ¶ 50, are "invalid
agency action" under the APA (third cause of action), *id.* ¶ 69, fail the "rational basis test for
exercise of delegated authority in administrative law" because they "grant employment
authorization to . . . illegal aliens" (fourth cause of action), *id.* ¶¶ 74-75, and do not constitute a
lawful exercise of prosecutorial discretion (fifth cause of action), *id.* ¶¶ 79-84.

and-comment requirements (second cause of action); and (3) violated the "nondelegation doctrine" (sixth cause of action).  Compl. ¶¶ 50-88.

On December 4, 2014, Plaintiff Arpaio filed a Motion for a Preliminary Injunction (Pl.'s Mot.) (ECF No. 6).  Plaintiff's motion states that the 2014 Deferred Action Guidance "is the primary document of the programs in dispute."  Pl.'s Mot. at 7.[15]  He argues the Court should grant a preliminary injunction because he allegedly would suffer irreparable injury absent an injunction by having to divert resources "to handle the flood of increased illegal immigration" and purported increase in crime that DACA and the 2014 Deferred Action Guidance will cause.  Pl.'s Mot. at 14.  In his December 9, 2014 Statement of Briefing Scheduling (ECF No. 12), Plaintiff conceded that "the legal criteria for a preliminary injunction apply more weakly to those who are already holding deferred action and work authorization under DACA."  *Id.* at 10.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy," which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  "A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

---

[15] In addition, Plaintiff indicates that he is not challenging the 2014 Prioritization Guidance, calling it "less important (for the purposes of the instant case)," and stating that it "concerns internal prioritization of [DHS's] work, and does not grant affirmative benefits . . . to certain illegal aliens, which is the essence of the current dispute."  Pl.'s Mot. at 10-11.

## ARGUMENT

I.   **THE COURT SHOULD DENY PLAINTIFF'S MOTION AND DISMISS THIS ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFF LACKS STANDING.**

Before addressing the merits of Plaintiff's motion for a preliminary injunction, this Court must determine whether it has subject matter jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014); *Zukerberg v. D.C. Bd. of Elections & Ethics*, 999 F. Supp. 2d 79, 82 (D.D.C. 2013).  Plaintiff plainly lacks standing to challenge the guidance at issue in this case, and the Court therefore lacks jurisdiction to entertain Plaintiff's claims.  Accordingly, the Court should deny Plaintiff's motion and dismiss the entire case.  *See Steel Co.*, 523 U.S. at 94; *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 915 (D.C. Cir. 2003); *see also Munaf v. Geren*, 553 U.S. 674, 692 (2008) (finding it appropriate to "terminate the litigation" at the preliminary injunction stage if the "Government is entitled to judgment as a matter of law").

### A.  Plaintiff Lacks Article III Standing to Challenge the Deferred Action Guidance At Issue In This Case.

Federal courts sit to decide cases and controversies, not to resolve disagreements about policy or politics.  Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation and internal quotation omitted).  Article III standing "is an essential and unchanging part of the case-or-controversy requirement."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must demonstrate (1) a "concrete and particularized" injury-in-fact that is "actual or imminent," (2) a causal connection between the injury and defendants'

challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable

decision.  *Id.* (internal quotation marks omitted).

Plaintiff has failed to discharge this burden.  At its core, Plaintiff's lawsuit is a

generalized disagreement with the federal government's immigration policy, which cannot

support Article III standing.

> ### i.  Plaintiff Has Failed to Demonstrate Any Injury-In-Fact Traceable to the Specific Guidance He Challenges In This Litigation.

Plaintiff has failed to allege any concrete injury whatsoever to the Maricopa County

Sheriff's Office, let alone one traceable to the DHS policies challenged in this case.  That failure

is fatal to Plaintiff's Article III standing.  To be sure, Plaintiff's motion and declaration are

replete with conclusory and speculative allegations about the harm that the Sheriff's Office

allegedly incurs as a result of illegal immigration—from the depletion of resources to increases

in crime and danger to deputies, ostensibly supported by press releases issued by Plaintiff

himself.  *See* Pl's Mot. at 14-15.  But self-serving, conclusory allegations cannot give rise to

standing, and in any event, Plaintiff fails entirely to connect these alleged harms to the DHS

policies challenged in this litigation.  Moreover, Plaintiff's contention that he is harmed by

DHS's alleged non-enforcement of immigration laws runs up against the general principle that "a

citizen lacks standing to contest the policies of the prosecuting authority when he himself is

neither prosecuted nor threatened with prosecution."  *Linda R. S. v. Richard D.*, 410 U.S. 614,

619 (1973).

As an initial matter, the challenged DHS policies neither direct Plaintiff to take any

action nor restrain him in the performance of any of his duties.  Accordingly, this case is readily

distinguishable from cases in which law enforcement officials have been found to have standing

to sue a federal agency due to direct regulation of their official conduct.  *See, e.g., Fraternal*

*Order of the Police v. United State*s, 152 F.3d 998, 1001-1002 (D.C. Cir. 1998); *Lamont v.*

*O'Neill*, 285 F.3d 9, 12-14 (D.C. Cir. 2002).  Because Plaintiff's conduct is not regulated by the

policies at issue in this case, standing is "substantially more difficult to establish" here.  *Lujan*,

504 U.S. at 562 (internal quotation marks omitted); *see also Renal Physicians Ass'n v. U.S.*

*Dep't of Health & Human Servs.*, 489 F.3d 1267, 1269 (D.C. Cir. 2007).

Because the challenged DHS guidance does not directly impact him, Plaintiff is left to

make speculative and unfounded assertions about the alleged consequences of future increases in

illegal immigration that he implausibly claims will be caused by that guidance.  *See* Decl. of

Sheriff Joe Arpaio ¶¶ 7, 11-14 ("Arpaio Decl.") (ECF No. 6-7) (hypothesizing that "more illegal

aliens will be attracted into the border states," causing more "criminal aliens" to be "back onto

the streets of Maricopa County").  These allegations of future harm are far too conclusory,

generalized, and speculative to demonstrate the kind of concrete and particularized injury

required by Article III.  *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996);

*see also Sadowski v. Bush*, 293 F. Supp. 2d 15, 18-19 (D.D.C. 2003) (concluding that allegations

of "general harms caused by the Administration's immigration policies" fall short of

demonstrating a particularized injury to plaintiff); *People of Colo. ex rel. Suthers v. Gonzales*,

558 F. Supp. 2d 1158, 1165 (D. Colo. 2007) (holding that Colorado lacked standing to challenge

alleged non-enforcement of immigration laws based on allegations that such non-enforcement

could lead to a terrorist threat).  Indeed, a court addressing similar speculative allegations of

injury concerning DHS's 2012 DACA Guidance found them insufficient to establish standing.

*See Crane v. Napolitano*, 920 F. Supp. 2d 724, 745-46 (N.D. Tex. 2013), *appeal docketed*, No.

14-10049 (5th Cir. Jan. 14, 2014) ("[T]he Court finds that Mississippi's asserted fiscal injury is

purely speculative because there is no concrete evidence that the costs associated with the

presence of illegal aliens in the state of Mississippi have increased or will increase as a result of the [DACA] Directive or the Morton Memorandum.").

Although the speculative and generalized nature of Plaintiff's purported injuries is by itself sufficient to deny standing, Plaintiff's alleged injuries are also wholly disconnected from the challenged DACA and DAPA guidance.[16]  Indeed, Plaintiff provides no support whatsoever for the claim that DACA or DAPA have resulted or will result in a future increase in illegal immigration or the release of criminal aliens from custody.  To begin with, any decision to cross the border is made by the individual alien, not the federal government.  *See Texas v. United States*, No. B-94-228 (S.D. Tex. Aug. 7, 1995) (attached as Exhibit 19) (explaining that Texas's alleged expenditures as a result of illegal immigration were attributable to "conscious actions of aliens to enter Texas illegally"), *aff'd on other grounds by* 106 F.3d 661 (5th Cir. 1997); *see also Lujan*, 504 U.S. at 560-61.

Moreover, Plaintiff's conjecture that the deferred action guidance memoranda will cause a new wave of illegal immigration is directly contrary to the terms of those policies, which *do not apply* to recent arrivals.  Indeed, recent border crossers and those apprehended at the border are DHS enforcement priorities.  Aliens cannot be considered for DACA or DAPA unless they have "continuously resided in the United States since before January 1, 2010."  *See* 2014 Deferred Action Guidance at 4.  Plaintiff likewise provides no support for his speculation that the June 2012 DHS DACA memorandum—which applied only to certain individuals who resided in the United States since 2007—resulted in "an increased flood of illegal aliens into Arizona in 2014."  Arpaio Decl. ¶ 10.  In reality, the causes of increased illegal immigration in recent years

---

[16] Plaintiff makes no attempt to demonstrate that he suffers harms traceable to any aspect of the Provisional Waiver Guidance, the High-Skilled Businesses & Workers Guidance, or the grant of work authorization to recipients of deferred action pursuant to regulation.

are extremely complex and heavily influenced by factors wholly outside the United States'
control, including social, economic, and political strife in other countries.  *See, e.g.*, Dangerous
Passage: Central America in Crisis and the Exodus of Unaccompanied Minors: Hearing Before
the S. Foreign Relations Comm. at 1-3 (July 17, 2014) (Testimony of Ambassador Thomas A.
Shannon, Counselor of the Department of State) (attached as Exhibit 20).  Furthermore, the
Government continues its aggressive and substantial efforts specifically aimed at dispelling any
misperceptions about immigration benefits in the United States (the sufficiency of which are not
subject to challenge in this litigation).[17]  *See, e.g.*, Challenges at the Border: Examining the
Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border:
Hearing Before the S. Comm. on Homeland Security and Governmental Affairs at 4-5 (July 9,
2014) (statement of Craig Fugate, Administrator, Federal Emergency Management Agency, *et
al.*) ("Craig Fugate statement") (attached as Exhibit 21).

Not only does Plaintiff incorrectly speculate about the alleged effects of DACA and
DAPA, but he ignores the reality that these initiatives *promote* border security and *prevent* crime.
Specifically, by deferring the removal of individuals with significant community ties and no
significant criminal records, DACA and DAPA free up limited enforcement resources to focus
on "threats to national security, border security, and public safety," Prioritization Guidance at
3—the very types of aliens the Plaintiff claims the federal government *should* be pursuing.

Plaintiff has failed to plausibly allege that the crime rate in Maricopa County is traceable
to the 2012 DACA Memo or the 2014 Deferred Action Guidance.  Indeed, Plaintiff's speculation

---

[17] Any misperceptions that aliens hold about immigration benefits—whether perpetuated by
individuals such as Plaintiff, or by third parties not before the Court, such as smugglers seeking
to induce individuals to cross the border—would not be traceable to the Defendants.  *See
Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013) (plaintiff has burden to
demonstrate "that the defendant's *actual* action has caused" the alleged harm) (emphasis
added).

about the crime rate appears to rest solely on an unfounded implication that aliens who fall

within the DACA or DAPA guidelines are associated with an increased risk of criminal activity.

*See* Pl.'s Mot. at 14.  This assumption is baseless and affirmatively belied by the terms of DACA

and DAPA, which provide that individuals should be considered for deferred action only where

they are determined not to pose national security or public safety risks based on appropriate

background and criminal record checks.

As shown by Plaintiff's own declaration, his real complaint is with what he asserts to be a

"lack of desire by the Obama Administration to enforce the law" relating to the removal of repeat

criminal offenders.  Arpaio Decl. ¶ 30.  Indeed, as the September 3, 2014, letter from Plaintiff to

the Inspector General for the Department of Homeland Security reveals, Plaintiff believes that

"the problem and the awareness of the problem is not a recent matter, *but a long-term issue*."  *Id.*

Ex. 1 to Arpaio Decl. (emphasis added).  And even with respect to this more general complaint,

Plaintiff himself concedes that he is not sure whether the harm he alleges is traceable to *any*

actions by Defendants or rather to the acts of third-party aliens.  *See id.* ¶ 20 (indicating that he is

not sure whether previously-arrested aliens were "not deported" by ICE, or instead "were

deported and kept returning to the United States").  In short, any attempt to connect Plaintiff's

claimed injury to DACA and DAPA depends on multiple layers of speculation that are

unsupported even by Plaintiff's own statements.  Indeed, the very purpose of DACA and DAPA

is to facilitate DHS's aggressive efforts to focus its enforcement resources on priority removals.

Accordingly, Plaintiff lacks standing to challenge the policies at issue here.

Plaintiff's case is ultimately a policy disagreement with Defendants and their

determination about how best to prioritize federal immigration resources, *see* Arpaio Decl. ¶ 2, a

matter committed by the Constitution and the INA to the federal government.  A policy dispute

such as this cannot satisfy the requirements for Article III standing.  The Supreme Court has

consistently admonished that "'a plaintiff raising only a generally available grievance about

government—claiming only harm to his and every citizen's interest in [the] proper application of

the Constitution and laws, and seeking relief that no more directly [or] tangibly benefits him than

it does the public at large—does not state an Article III case or controversy.'"  *Lance v. Coffman*,

549 U.S. 437, 439 (2007) (citing *Lujan*, 504 U.S. at 560-61).

> ### ii.  Plaintiff's Purported Injury Is Not Redressable By The Relief Sought Or Any Relief Plaintiff Could Plausibly Secure In This Litigation.

Even if Plaintiff had plausibly alleged an injury-in-fact traceable to the deferred action

guidance at issue, he would still lack Article III standing because such harms—continued

presence of complained-of aliens—would not be redressed by the injunction he seeks.

Enjoining DACA and DAPA, as Plaintiff seeks to do, would not compel the ultimate

removal of any alien.  Plaintiff does not and cannot challenge the Secretary of Homeland

Security's general authority to exercise prosecutorial discretion; nor does Plaintiff contend that

this Court has authority to compel DHS to remove an individual over DHS's objection.  *See*

*Arizona*, 132 S. Ct. at 2499 ("A principal feature of the removal system is the broad discretion

exercised by immigration officials.").  Moreover, because DHS has limited resources, DHS still

will have to prioritize removals.  *Cf.* Pl.'s Mot. at 12 (conceding that regardless of DACA or

DAPA, the affected aliens "are very unlikely to be deported").

> ### B.  Prudential Considerations Further Undermine This Court's Authority To Review This Challenge.

Prudential considerations about the "the proper—and properly limited—role of the courts

in a democratic society" further undermine this Court's authority to review Plaintiff's challenge

to the Secretary's enforcement of the INA.  *See Bennett v. Spear*, 520 U.S. 154, 162 (1997)

(quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Among other things, such considerations

restrain courts from "adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches."  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) (internal citations omitted).  Courts will also decline review where a plaintiff's grievance does not "arguably fall within the zone of interests protected or regulated by the statutory provision" in question.[18]  *See Bennett*, 520 U.S. at 162.

Prudential considerations counsel against adjudication of Plaintiff's generalized grievance about immigration policy, which would improperly inject this Court into matters that are committed to the plenary authority of the federal political branches.  *See Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").

Plaintiff also does not fall within the zone of interests protected by the INA.  *See Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996) (holding that individuals living in immigration-impacted areas lacked prudential standing to claim that "a rush of immigrants adversely affects the welfare of the Federation's members by generating unemployment and wage reductions and burdening public services").  Plaintiff is not personally

---

[18] In *Lexmark International, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court recently suggested that the restriction on entertaining generalized grievances, though commonly couched in terms of prudential standing, may actually be a limit on Article III standing.  *Id.* at 1387 n.3.  At the same time, the Court held that in some circumstances the "zone of interests" test is better understood as an inquiry into whether Congress intended to provide a particular type of plaintiff a cause of action, rather than a prudential limitation on standing. *Lexmark*, however, addresses causes of action under a specific statute rather than the general cause of action established by the Administrative Procedure Act.  And, in any event, it makes clear that the "zone of interests" test remains focused on whether the statute is intended to protect the class of persons encompassing the plaintiff from the harm that has occurred as a result of the alleged statutory violation.  *Id.* at 1388-89 & n.5.

subject to the INA's provisions, but instead complains of alleged indirect harm from the exercise

of prosecutorial discretion by federal officials under the INA.  *See* Pl.'s Mot. at 18-19, 22-23.

There is also no indication that Congress enacted the INA—and in particular, the provisions of

the INA dealing with removal authority—to confer a particular benefit on local law enforcement

officials.  And there is no reason to believe that Congress intended to permit such officials to

police the federal government's enforcement efforts in this uniquely federal area of law.  *See*

*Arizona*, 132 S. Ct. at 2499; *see also* Compl. at 19 (acknowledging that "as current legal

precedent has found[,] he and other similarly situated state law enforcement and other officials

have no authority to [enforce immigration laws]").  The Court therefore lacks authority to review

Plaintiff's claims.

## II.   PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

Because Plaintiff has failed to establish Article III standing, he has necessarily failed to

meet the higher standard required for the extraordinary relief of a preliminary injunction: proof

of injury that is irreparable.  The D.C. Circuit "has set a high standard for irreparable injury."

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  The injury to the movant "must be both

certain and great," as well as "actual and not theoretical."  *Wis. Gas Co. v. FERC.*, 758 F.2d 669,

674 (D.C. Cir. 1985).  The movant must also "substantiate" its "claim that irreparable injury is

'likely' to occur" with appropriate factual evidence.  *Id.*  Failure to meet this "high standard"

renders a plaintiff ineligible for preliminary injunctive relief, regardless of the remaining factors.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Here, for the same reasons he lacks an injury-in-fact, and even more so in light of the

heightened standard for irreparable harm, Plaintiff falls well short of demonstrating the harm

required for preliminary injunctive relief.  Plaintiff's claim of irreparable harm rests on his

speculation that the challenged policies will cause a "flood of increased illegal immigration," and will lead to increased crime, danger to the Sheriff's deputies, and a drain on office resources. Pl's. Mot. at 14.  Plaintiff simply offers no basis to conclude that this outcome is "'likely' to occur" as a "direct[] result" of the DHS policies he seeks to enjoin.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

In addition, part of Plaintiff's challenge is to DACA guidance that has been in effect since 2012, and Plaintiff has acknowledged that "the legal criteria for a preliminary injunction apply more weakly to those who are already holding deferred action and work authorization under DACA."  ECF No. 12 at 10.  Plaintiff's two-year delay in seeking to enjoin the 2012 guidance "implies a lack of urgency and irreparable harm" and supports the denial of emergency relief.  *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005); *see also, e.g.*, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *Brown v. Dist. of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012).

Having failed to demonstrate that he stands to suffer any actual and certain harm in the absence of an injunction, Plaintiff posits that "a colorable constitutional violation" is sufficient to "give[] rise to a showing of irreparable harm."  Pl.'s Mot. at 14 (citing *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).  As an initial matter, Plaintiff has failed to allege a colorable constitutional violation.  His vague reference to the "architecture and basic design of the U.S. Constitution," *see* Pls.' Mot. at 16, is insufficient to convert his claims, which are statutory in nature, into colorable constitutional ones.  Moreover, it is not the existence of a constitutional violation in the abstract that may give rise to irreparable harm, but rather a plaintiff's "loss of constitutional freedoms." *Mills*, 571 F.3d at 1312.  Thus, even if Plaintiff's general incantation of structural constitutional concerns were sufficient to state a colorable

constitutional violation, he has failed to show how the guidance he challenges infringes any

freedoms that the Constitution secures *to him*.  *See Sweis v. U.S. Foreign Claims Settlement

Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013).

Because Plaintiff has entirely failed to demonstrate that he will suffer irreparable harm in

the absence of emergency relief, his motion can be denied on this basis alone.

### III.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.[19]

#### A. Deferred Action Is An Unreviewable Exercise of Enforcement Discretion Under *Heckler v. Chaney*.

Plaintiff's claim that the Secretary of Homeland Security exceeded his authority in

providing for prosecutorial discretion through DACA and DAPA fails because it is a matter not

subject to judicial review.  *Heckler v. Chaney*, 470 U.S. 821 (1985), is directly on point here.  In

that case, the Supreme Court held that an agency's decision not to exercise its enforcement

authority, or to exercise it in a particular way, is "presumed" to be "immune from judicial review

under § 701(a)(2)" of the APA.  *Id.* at 832; *Balt. Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456, 459

(D.C. Cir. 2001).  The D.C. Circuit has recognized that the principles animating *Chaney* and its

progeny "may well be a requirement of the separation of powers commanded by our

Constitution."  *Balt. Gas & Elec. Co.*, 252 F.3d at 459; *see also Sec'y of Labor v. Twentymile

Coal Co.*, 456 F.3d 151, 157 (2006) (noting that "the traditional nonreviewability" of

prosecutorial discretion applies to administrative enforcement); *Town of Castle Rock v.*

---

[19] Although "it remains an open question" in this Circuit "whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits," *Aamer*, 742 F.3d at 1043 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)), it makes no difference here.  Plaintiff has not shown that the other three preliminary-injunction factors "strongly favor" entry of an injunction.  Thus, Plaintiff must show a "likelihood of success" on the merits.  *Id.*  He can show neither that nor even a serious merits question.

*Gonzales*, 545 U.S. 748, 761 (2005) (noting the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands").[20]

The rationale for non-reviewability in the enforcement context is that an "agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. The *Chaney* Court noted at least three reasons why agency enforcement decisions generally are not reviewable. First, an agency's enforcement strategy "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32. Second, an agency's decision not to exercise its enforcement authority "generally does not involve [the] exercise [of] *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. Third, an agency's exercise of enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const., art. II, § 3).

The Court of Appeals for this Circuit has held that this presumption of nonreviewability may be overcome only in three circumstances: (1) where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers"; (2) where the agency

---

[20] Regardless of whether Plaintiff's claim is styled as a statutory claim or some imprecise claim emanating from the structure of the Constitution, the result is the same: the Executive has broad authority to exercise discretion in enforcing the nation's immigration laws and the challenge to that enforcement is not a matter subject to judicial review. But, as explained below, even if it were subject to judicial review, Defendants have acted within and consistent with the broad authority provided by the INA in a manner recognized by the Supreme Court.

refuses "to institute proceedings based solely on the belief that it lacks jurisdiction"; and (3) where the agency "has conspicuously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Balt. Gas & Elec. Co.*, 252 F.3d at 460 (internal citations omitted). None of these exceptions applies here.

### i. Congress Has Not Limited DHS's Exercise of Discretion Through Deferred Action.

Deferred action is a longstanding form of prosecutorial discretion used by federal immigration authorities. *See*, *e.g.*, *AAADC*, 525 U.S. at 483-84. Contrary to Plaintiff's claims, *see* Pl.'s Mot. at 22-23, individuals who receive deferred action do not receive legal status. *See* 2014 Deferred Action Guidance at 2 ("Deferred action does not confer a legal status in this country."). Nor does deferred action provide citizenship, or even a path to citizenship. *Id.* Rather, deferred action represents a time-limited decision to de-prioritize the removal of certain individuals, upon a case-by-case assessment. *Id.* Further making clear that deferred action is not legal status or "amnesty," it can be revoked at any time in the agency's discretion. *See id.*

The Supreme Court has repeatedly and explicitly recognized that the INA grants broad discretion to the Executive Branch, including the decision whether to initiate removal proceedings or grant deferred action: "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *See Arizona*, 132 S. Ct. at 2499; *see also AAADC*, 525 U.S. at 483-84 ("At each stage" of the removal process, "the Executive has discretion to abandon the endeavor"); *id.* (explaining that, as of 1996, "the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience"); *id.* at 485

(challenged INA provision "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations").

No provision of the INA restricts the exercise of prosecutorial discretion through the use of deferred action.[21]  Indeed, the INA undoubtedly makes discretion available for immigration enforcement policies such as those challenged here.  *See* 8 U.S.C. § 1103(a); 8 C.F.R. § 2.1.[22] Through the INA, Congress has authorized the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute.  8 U.S.C. § 1103(a)(3) (emphasis added).  The Supreme Court has found that similar language commits action to agency discretion by law.  *See Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997).

Not only has Congress not limited the Executive's use of deferred action, but DACA and DAPA are consistent with the substantive priorities established by Congress.  *Cf. Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011).  The INA clearly prioritizes the detention and removal of threats to border security, national security, and public safety.  *See*, *e.g.*, 8 U.S.C. § 1225 (establishing "expedited removal" for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for certain criminal aliens); *id.* § 1226a (providing mandatory detention of suspected terrorists); *see also* Consolidated Appropriations Act, 2014, Pub. L. No.

---

[21] Plaintiff cites to 8 U.S.C. § 1182 for examples of who is considered an inadmissible alien, *see* Pl.'s Mot. at 22-23, but that misses the point.  DHS is not conferring lawful status on individuals who receive deferred action.  DHS is temporarily deferring enforcement action against them, thereby freeing up DHS's limited enforcement resources to remove higher priority aliens.

[22] 8 C.F.R. § 2.1, the regulation implementing 8 U.S.C. § 1103, states that "[a]ll authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws are vested in the Secretary of Homeland Security," and the Secretary may "in his [or her] discretion" delegate her authority and through "regulation, directive, memorandum or other means deemed appropriate," announce principles "in the exercise of the Secretary's discretion."

113-76, Div. F., Tit. II, 128 Stat. 5, 251 (2014) (requiring DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime").

At the same time, numerous provisions of the INA reflect a concern for ensuring family unity among U.S. citizens and their undocumented families.  *See INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of the United States citizens and immigrants united.'") (quoting H.R. Rep. No. 85-1199, at 7 (1957)).  And deep-rooted principles of fairness, including as reflected in the INA, support the exercise of leniency toward individuals who lack culpability for their violations of the law.  *See*, *e.g.*, 8 U.S.C. § 1182(a)(6)(C)(ii)(II) (alien not inadmissible for falsely claiming citizenship if "the alien permanently resided in the United States prior to attaining the age of 16, and alien reasonably believed at the time of making such representation that he or she was a citizen").

DACA and DAPA directly advance the interests articulated by Congress:  prioritizing the removal of serious criminals, national security threats, and recent border crossers, and deprioritizing the removal of certain aliens who lack culpability for unlawfully entering the country or who have immediate family members lawfully present.  Concurrent with the Secretary's determination to further dedicate CBP's and ICE's limited enforcement resources to high-priority targets, *see* Prioritization Guidance at 1, DACA and DAPA help prevent the unwise expenditure of removal resources on the lowest priority aliens by having a different agency— USCIS—implement DACA and DAPA through fees paid by the deferred action requestors.

Although requestors under DACA and DAPA are, as a general matter, low-priority aliens with strong ties to the United States, to ensure that grants of deferred action are consistent with the agency's enforcement priorities, the Secretary reaffirmed that the revised DACA and DAPA

policies would continue the case-by-case, individualized consideration that has characterized

DACA since its inception in 2012, to ensure that each requestor is not an enforcement priority

and does not possess a characteristic that would make deferred action inappropriate.  *See* 2014

Deferred Action Guidance at 2, 4-5; *see also* DACA Memo at 2 (noting individualized

consideration).[23]

Exercising prosecutorial discretion through deferred action for individuals who came to

the United States as children and for parents of U.S. citizens or LPRs also serves other

recognized interests.  The Supreme Court has explicitly recognized humanitarian and other

interests in the Executive's enforcement of immigration laws:

> Discretion in the enforcement of immigration law embraces immediate human
> concerns.  Unauthorized workers trying to support their families, for example,
> likely pose less danger than alien smugglers or aliens who commit a serious
> crime.  The equities of an individual case may turn on many factors, including
> whether the alien has children born in the United States, long ties to the
> community, or a record of distinguished military service.  Some discretionary
> decisions involve policy choices that bear on this Nation's international relations.

*Arizona*, 132 S. Ct. at 2499; *see also AAADC*, 525 U.S. at 483-84 (describing long-recognized

humanitarian rationale as well as administrative convenience for deferred action).  Both DACA

and DAPA appropriately reflect these concerns.  *See, e.g.*, 2014 Deferred Action Guidance at 3

---

[23] Plaintiff baselessly dismisses this individualized determination as a "fiction."  *See, e.g.,* Pl.'s
Mot. at 4.  But, as of December 5, 2014, of the 719,746 individuals who made initial requests for
deferred action under DACA, 42,632 applications were rejected, 630,032 were approved, and
36,860 were denied.  *See* DHS, Current Statistics: Deferred Action for Childhood Arrivals:
Pending, Receipts, Rejected, Approvals, and Denials (2014) (attached as Exhibit 22).  Further,
those who request DACA likely are a self-selecting group.  In any event, agencies may establish
frameworks for the exercise of prosecutorial discretion.  *See, e.g.*, *Chaney*, 470 U.S. at 824
(challenge to a general enforcement policy regarding the use of drugs in executions); *Ass'n of
Irritated Residents v. E.P.A.*, 494 F.3d 1027 (D.C. Cir. 2007) (holding non-reviewable a broad
agreement between the agency and an entire industry, which deferred agency enforcement for
several years); *United States v. 9/1 Kg. Containers*, 854 F.2d 173, 178 (7th Cir. 1988) (endorsing
FDA "non-enforcement policy").  Moreover, the deferred action guidance at issue here directs
that each request for deferred action be assessed on a discretionary, case-by-case basis.

(recognizing that most individuals considered for DACA and DAPA "are hard-working people who have become integrated members of American society").

In sum, the Executive's exercise of prosecutorial discretion pursuant to the guidance challenged by Plaintiff corresponds to the substantive priorities established by Congress and upheld by the Supreme Court. The presumption of non-reviewability therefore stands.

### ii.   DHS Has Not Stated A "Belief That It Lacks Jurisdiction."

The presumption of non-reviewability also applies here because DHS has not suggested, in providing guidance for the exercise of deferred action, that the agency believes it lacked jurisdiction to make enforcement decisions; nor was any such belief a basis for issuing the guidance. *See Balt. Gas & Elec. Co.*, 252 F.3d at 460. Plaintiff cannot demonstrate otherwise.

### iii.   DHS's Tailored Deferred Action Guidance Does Not Constitute "An Abdication of" DHS's "Statutory Responsibilities."

Finally, any suggestion by Plaintiff that the Secretary's exercise of prosecutorial discretion through DACA and DAPA "is so extreme as to amount to an abdication of [DHS's] statutory responsibilities," *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc), is meritless. "Congress has not given [DHS] an inflexible mandate to bring enforcement actions against all violators of the [immigration laws]." *Cutler v. Hayes*, 818 F.2d 879, 893 (D.C. Cir. 1987) (distinguishing *Adams*, 480 F.2d at 1161). To the contrary, Congress has expressly recognized that DHS must set priorities to do its work effectively and consistent with the public interest, and both Congress and the Supreme Court have recognized deferred action as one such mechanism for exercising prosecutorial discretion. DACA and DAPA allow for deferral of the removal of certain low-priority aliens, so that removal resources can be directed at higher priority aliens. Because no alien is automatically entitled to relief under DACA and DAPA—and because even those who do receive deferred action may have it revoked at any

time—these policies do not negate any past violations of immigration laws Congress enacted.

This type of administrative postponement or deferment of enforcement is not a basis for judicial

intervention.  *Id.* at 894.

DHS's effort to prioritize the removal of those who present a risk to public safety,

national security, and border security over those who have long ties to this country is fully

consistent with the priorities Congress has set.  Indeed, DHS's allocation of enforcement

priorities stands in stark contrast to *Adams*, a case relied upon by Plaintiff.  *See Ass'n of Civilian*

*Technicians, Inc. v. FLRA*, 283 F.3d 339, 344 (D.C. Cir. 2002) (describing *Adams* as a case in

which "the Secretary of Health, Education, and Welfare declined to enforce an entire statutory

scheme, Title VI of the Civil Rights Act of 1964"); *see also Adams*, 480 F.2d at 1162

(distinguishing case from an exercise of prosecutorial discretion based on the fact that the

Department of Health, Education, and Welfare was "actively supplying segregated institutions

with federal funds, contrary to the expressed purposes of Congress").  And, in any event, "[r]eal

or perceived inadequate enforcement of immigration laws does not constitute a reviewable

abdication of duty."  *Texas v. United States*, 106 F.3d at 661.

Congress's funding choices further reinforce the point.  DHS's limited resources will

always constrain how many aliens can be removed every year.  DHS has estimated that

"Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens

each year, a significant percentage of whom are typically encountered at or near the border rather

than in the interior of the country."  *See* OLC Op. at 9.  Even if all 400,000 such removals could

be dedicated to the interior,[24] that would represent less than 4% of the 11.3 million

---

[24] Due to recent demographic changes among aliens apprehended at the border (*see* section
IV.A.), more than half of ICE's removals in recent years have involved aliens apprehended at the
border rather than in the interior. *See* U.S. Immigration and Customs Enforcement, ERO Annual

undocumented aliens in the country.  *See id.*  This limitation follows in part from the fact that

Congress's appropriations require DHS to maintain a level of approximately 34,000 detention

beds.  *See* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat.

5, 251 (2014) ("funding made available under this heading shall maintain a level of not less than

34,000 detention beds through September 30, 2014").  Based largely on these resource

constraints, DHS has been instructed to not "simply round[] up as many illegal immigrants as

possible, which is sometimes achieved by targeting the easiest and least threatening among the

undocumented population," but to ensure  "that the government's huge investments in

immigration enforcement are producing the maximum return in actually making our country

safer."  *See* H.R. Rep. 111-157, at 8.  That is precisely the object of DACA and DAPA.  Even

setting aside persons granted deferred action under DACA and DAPA, the number of removable

aliens exceeds the resources that DHS has to remove them.

Further, DACA and DAPA build on the Executive's long history of exercising

prosecutorial discretion through the identification of certain discrete groups of aliens who may

be eligible for an exercise of discretion.   *See* OLC Op. at 14-18 (providing examples).  This

approach dates back to the 1950s.  *See id.* at 14.  More recently, under the "Family Fairness"

program in 1990, the Executive granted "indefinite voluntary departure" and provided work

authorization for certain aliens who were ineligible for legal status under the Immigration

Reform and Control Act of 1986 but who were the spouses and children of aliens who qualified

for legal status under the Act.  *See id.* at 14-15.  Since the 1990s, the Executive also has used

deferred action for battered aliens who were waiting for visas to become available under VAWA,

---

Report: FY 2013 ICE Immigration Removals at 1 (noting that 235,093 removals out of the
368,644 total removals that ICE conducted in FY 2013 were of individuals apprehended along
the border), available at http://www.ice.gov/doclib/about/offices/ero/pdf/2013-ice-immigration-
removals.pdf.

applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000, foreign students affected by Hurricane Katrina, and widows and widowers of U.S. citizens.  *See id*. at 15-18.

In short, DACA and DAPA are an entirely appropriate part of a long tradition of enforcement prioritization and discretion by the Executive, grounded in its statutory and constitutional authority to determine how best to use the limited resources available to enforce the nation's immigration laws.  *See Arizona*, 132 S. Ct. at 2499.  They are therefore not reviewable under *Chaney*.

## B.  Plaintiff's APA Claims Lack Merit.

Even if Plaintiff's challenge to DACA and DAPA was justiciable notwithstanding *Chaney*—which it is—Plaintiff's claims of a violation of the APA are meritless.  The APA permits judicial review of "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704; *Bennett*, 520 U.S. at 154.   Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory . . . authority, 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).  DACA and DAPA are consistent with the APA, both procedurally and substantively.

### i.  As a Procedural Matter, The Deferred Action Guidance Is Explicitly Exempt From the Notice-And-Comment Requirement Of The APA.

The DACA and DAPA guidance challenged by Plaintiff comports with the procedural requirements of the APA.  This guidance reflects a general statement of policy by the agency, a type of agency action that the APA explicitly exempts from the notice-and-comment requirements.  *See* 5 U.S.C. § 553(b)(3)(A); *see also Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)

(holding that the APA exempts from notice-and-comment "general statements of policy," which the Supreme Court has described as "'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'") (citations omitted).  Accordingly, Plaintiff's Second Cause of Action, in which he argues that DHS's deferred action guidance contravenes the APA's notice-and-comment requirements, *see* Compl. at ¶¶ 62-68, must fail.

Plaintiff does not recognize, let alone address, that DHS's deferred action guidance is a general statement of policy, and thus exempt from notice-and-comment.  Rather, he claims, without citation to fact or law, that the agency is "issuing new regulations . . . without going through the detailed rule-making process."  *See* Pl.'s Mem. at 16 (referring to Second Cause of Action in Compl. ¶¶ 62-68).  However, even assuming that the DACA and DAPA guidance "would qualify as a 'rule,' within the meaning of the APA, [they] would be exempt from notice-and-comment requirements" as general statements of policy.  *Lincoln v. Vigil*, 508 U.S. at 197 (finding the announcement that the agency will discontinue a discretionary allocation of funds to be a general statement of policy).  The Supreme Court, in differentiating statements of policy from rules, has described a "general statement of policy" as an issuance that does "not have the force and effect of law."  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31 (1979).  The challenged DHS guidance concerning deferred action states that it "confers no substantive right, immigration status or pathway to citizenship," 2014 Deferred Action Guidance at 5; the guidance instead provides for an individualized decision concerning the exercise of prosecutorial discretion.  *See id.*; DACA Toolkit at 25-26.  Indeed, the guidance makes clear that deferred action may be denied notwithstanding the requestor's ability to meet the relevant guidelines.  *Id.*; *cf. Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1017 (9th Cir. 1987) (concluding that a legacy INS

operating instruction on deferred action was a general statement of policy, because, *inter alia*, "[t]he Instruction [left] the district director free to consider the individual facts in each case" (internal quotation marks and citation omitted)); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (recognizing that an agency "vested with discretionary power" may determine, in a manner consistent with the APA, that it will or will not use that power "in favor of a particular class on a case-by-case basis").  The challenged guidance therefore constitutes a general statement of policy exempt from APA notice-and-comment, *see* 5 U.S.C. § 553(b)(3)(A).

### ii.   The Deferred Action Guidance Fully Complies With The APA.

Any substantive challenge to DHS's DACA and DAPA guidance under the APA must fail, because the DHS guidance was issued in accordance with Congress's broad and explicit vesting of authority in the Secretary, charging him with "the administration and enforcement of [the INA and all other laws] relating to the immigration and naturalization of aliens," *see* 8 U.S.C. § 1103, and the responsibility for "[e]stablishing national immigration enforcement policies and priorities."[25]  6 U.S.C. § 202(5).  With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA.  *Arizona*, 132 S. Ct. at 2499.

In light of the Secretary's significant discretion in enforcing the INA, Plaintiff cannot support his unsubstantiated claim that DACA and DAPA exceed the Secretary's statutory authority or are otherwise arbitrary and capricious.  Regarding the former, Plaintiff cites to no

---

[25] As noted above, Plaintiff's attempt to frame his claim that Defendants have acted outside of their statutory authority as a constitutional deficiency is an attempt to constitutionalize his statutory claims.  Plaintiff's first cause of action, like the third, fourth, and fifth causes of action, can and should be considered, collectively, as statutory authority challenges under the APA.  *See INS v. Chadha*, 462 U.S. 919, 954 n.16 (1983) (holding that delegated "Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review").

statutory provision of the INA that conflicts with or is exceeded by the implementation of the

guidance memoranda, except for a vague reference to INA statutory bars to admissibility that are

unrelated to the exercise of prosecutorial discretion through deferred action, *see* Pl.'s Mot. at 10.

As explained further above, DACA and DAPA are entirely consistent with congressional

directives and Supreme Court precedent.  As to Plaintiff's latter claim, "[t]he 'arbitrary and

capricious' standard deems the agency action presumptively valid provided the action meets a

minimum rationality standard."  *White Stallion Energy Ctr., LLC v. E.P.A*., 748 F.3d 1222, 1233

(D.C. Cir. 2014).  Here, the challenged guidance easily meets this highly deferential standard of

review; as the Secretary explained in his memorandum, "[c]ase-by-case exercises of deferred

action for children and long-standing members of American society who are not enforcement

priorities are in this Nation's security and economic interests."  2014 Deferred Action Guidance

at 3.

Plaintiff's further claim that the deferred action guidance fails rational basis review

because it "grant[s] employment authorization . . . to illegal aliens" is based on the flawed

premise that the challenged guidance is what grants employment authorization to individuals

who request deferred action.  Compl. ¶¶ 74-75.  As discussed above, it is the INA and

longstanding regulations promulgated under its authority—not DACA or DAPA—that authorize

the Secretary to grant work authorization to particular classes of aliens.  *See* 8 U.S.C.

§ 1324a(h)(3); 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048-50 (5th Cir.

1990) ("employment authorization . . . [is] purely [a] creature[] of regulation.").  Although the

INA requires the Secretary to grant work authorization to some classes of aliens, *see*, *e.g.,* 8

U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's

authority to grant work authorization generally, and expressly contemplates that the Secretary

may grant work authorization to aliens lacking lawful immigration status, s*ee, e.g.*, 8 U.S.C.

§ 1226(a)(3) (permitting Secretary to grant work authorization to certain aliens who have been

arrested and detained pending a decision whether to initiate removal proceedings).  Conversely,

no law abrogates the Secretary's authority to consider granting work authorization to DACA and

DAPA requestors.  And the Secretary's articulated basis for issuing guidance related to work

authorizations—to "encourage these people to come out of the shadows," 2014 Deferred Action

Guidance at 3—is clearly rational.

Moreover, Plaintiff's contention that DHS's enforcement guidance is invalid agency

action under Section 706(1) of the APA, Pl.'s Mot. at 16, is meritless because of the discretion

afforded to DHS to enact immigration policy priorities.  "[A] claim under § 706(1) [of the APA]

can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action

that it is *required to take*."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)

("SUWA") (emphasis in original).  Section 706(1) only "empowers a court to compel an agency

'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without

directing *how* it shall act."  *Id.* (citing Att'y Gen.'s Manual on the Admin. Procedure Act 108

(1947)) (emphasis in original).  The APA does not contemplate "pervasive oversight by federal

courts over the manner and pace of agency compliance with [broad] congressional directives[.]"

*Id.* at 67.  Here, Plaintiff seeks exactly the kind of judicial entanglement in discretionary policy

decisions that the APA precludes.

### iii.   DHS's Guidance Memoranda Discussing Proposed Regulations Do Not Constitute Final Agency Action.

Finally, Plaintiff has failed to demonstrate that the other memoranda that he half-

heartedly challenges—the High-Skilled Businesses and Workers Guidance, Exhibit 18, and the

Provisional Waiver Guidance, Exhibit 17—represent final agency action under the APA.  *See* 5

U.S.C. § 704 (actions reviewable under the APA must be made either reviewable by statute or be considered final agency action).  Neither of these memoranda constitutes final agency action, and they therefore cannot be challenged under the APA.  In order for an agency action to be "final," it must be something more than a "merely tentative or interlocutory decision;" it must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78.[26]

These two guidance memoranda are merely tentative decisions that do not create any legal consequences.  Here, the tentative nature of the High-Skilled Businesses and Workers Guidance is illustrated, for example, by the fact that USCIS has been tasked with issuing guidance and regulations to "clarify" how to interpret certain provisions of the INA and "propose a program."  High-Skilled Businesses and Workers Guidance at 3-4.  Likewise, the Provisional Waiver Guidance directs USCIS to "amend its 2013 regulation" to "expand access to the provisional waiver program to all statutorily eligible classes of relatives for whom an immigrant visa is immediately available"; the Provisional Waiver Guidance also directs USCIS to "provide additional guidance" on a term used in a pre-existing regulation and to "clarify the factors" considered by adjudicators on whether the extreme hardship standard has been met in adjudicating applications for provisional waivers.  *See* Provisional Waiver Guidance at 2.

These guidance memoranda thus do not serve as the basis for granting or denying any of the enumerated employment-based visas or provisional waivers for "extreme hardship."  Nor do they impose a regulatory requirement that applicants must now meet.  These two memoranda "neither mark the consummation of the agency's decision-making process," nor do they

---

[26] The deferred action memoranda likewise are not final agency action:  they do not grant deferred action, and by their terms, they "confer[] no substantive right, immigration status, or pathway to citizenship."  2014 Deferred Action Guidance at 5; *see* 2012 DACA Memo at 3.

determine "plaintiff's legal rights or obligations." *Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

### C.  Plaintiff's Non-Delegation Claim Also Lacks Merit.

Plaintiff, relying on *Am. Trucking Ass'ns, Inc., v. U.S. Envtl. Prot. Agency*, 175 F.3d 1027 (D.C. Cir 1999) —a D.C. Circuit case that was later reversed by the Supreme Court on the issue of nondelegation, *see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)—claims that the deferred action guidance violates the "nondelegation doctrine." *See* Compl.¶¶ 85-88, Pl.'s Mot. at 17-18.  Under this doctrine, the "constitutional question is whether the statute has delegated legislative power to the agency." *Whitman,* 531 U.S. at 472.  The Supreme Court has long recognized that "absent an ability to delegate power under broad general directives," Congress "simply cannot do its job." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).

Here, the INA authorizes the Secretary to establish regulations, issue instructions, and "perform such other acts *as he deems necessary* for carrying out his authority under the statute." 8 U.S.C. § 1103(a)(3) (emphasis added); *see also* 8 U.S.C. § 1324a(h)(3) (defining the term "unauthorized alien" as meaning that the alien is not at that time "authorized to be so employed by this chapter or by the Attorney General.").  The "scope of discretion" delineated by Section 1103 is "well within the outer limits of [the Supreme Court's] nondelegation precedents." *Whitman*, 531 U.S. at 474.

### IV.    GRANTING A PRELIMINARY INJUNCTION WOULD HARM DEFENDANTS AND THE PUBLIC INTEREST.

Finally, Plaintiff has failed to demonstrate—as he must—that "the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties" and that "granting the preliminary injunction would be in the public interest." *Whitaker*

*v. Thompson*, 248 F. Supp. 2d 1, 7-8 (D.D.C. 2002) (citing *Mova. Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977).  Here, the balance of the equities and the public interest weigh overwhelmingly against Plaintiff and his request for a preliminary injunction.  As established above, Plaintiff's alleged harms are entirely speculative and disconnected from the agency guidance he seeks to challenge.  In contrast, enjoining the ongoing and successful implementation of DACA (which has been in place since 2012), and preventing DHS from implementing the 2014 Deferred Action Guidance, would cause serious harm and disruption nationwide, and would undermine DHS's comprehensive efforts to organize its resources to focus on its top enforcement priorities: national security, border security, and public safety.

### A.  The Challenged Deferred Action Policies Promote Congressionally-Mandated Public Safety And National Security Objectives.

Congress has directed DHS, an agency with limited resources, to prioritize the removal of aliens who pose a threat to national security, border security, and public safety.  *See supra* at 4-5.  As explained above, that is precisely what DACA and DAPA help DHS to accomplish.  2014 Deferred Action Guidance at 3-5.  Individuals participating and those who may participate include high school graduates and parents of U.S. citizens or LPRs, all of whom have lived in the United States for at least five years and were determined on a case-by-case basis not to pose a threat to national security or public safety, or otherwise to present a factor that makes deferred action inappropriate.  DACA Memo at 1; 2014 Deferred Action Guidance at 4.  By creating a mechanism to identify efficiently these aliens who are a low priority for removal, DACA and DAPA help the government to focus its removal efforts on criminals and more recent border crossers.  Documents provided through grants of deferred action, for instance, allow immigration officials conducting enforcement actions to quickly distinguish recent arrivals and other

priorities—who may be removed more quickly under existing statutory authority—from lower-priority aliens whose cases may impose additional burdens on already backlogged immigration courts.

The need for DACA and DAPA is especially acute given recent developments affecting the removal of persons from the United States. At the border, for example, recent and sizable demographic shifts have necessitated a radical realignment in the Department's approach to border enforcement. For example, the U.S. Border Patrol is apprehending an increasing number of nationals from Central American countries at the border (paired with a decrease in the apprehension of Mexican nationals). *See* U.S. Customs and Border Protection, *USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014* (2014) (attached as Exhibit 23). This shift requires both: (1) a significant transfer of ICE resources to assist with the removal of aliens apprehended by the Border Patrol who are not immediately removable to a contiguous country, and (2) the expenditure of increased overall resources, as the removal of persons to non-contiguous countries is far more resource-intensive. *See* U.S. Immigration and Customs Enforcement, ERO Annual Report: FY 2013 ICE Immigration Removals at 3 (noting increase in CBP apprehension of non-Mexican nationals and corresponding increase in ICE removals of non-Mexican nationals apprehended by CBP), available at http://www.ice.gov/doclib/about/offices/ero/pdf/2013-ice-immigration-removals.pdf;. DHS Office of Inspector General, Detention and Removal of Illegal Aliens, No. OIG-66-33, 8 (Apr. 2006) (discussing increased ICE workload resulting from border apprehensions of non-Mexican nationals), available at http://www.oig.dhs.gov/assets/Mgmt/OIG_06-33_Apr06.pdf.

The Government continues to undertake substantial and successful efforts to stem illegal immigration across the Mexican border. This summer, for example, DHS shifted significant

resources across the Department to the border.  *See, e.g.*, Open Borders: The Impact of

Presidential Amnesty on Border Security: Hearing Before the House Comm. on Homeland

Security, 113th Cong. 3-4 (Dec. 2, 2014) (statement of Jeh C. Johnson, Secretary, U.S. Dep't of

Homeland Security) (attached as Exhibit 24).  And in recent months the U.S. Government has

held high-level discussions with Mexico and Central American countries, provided millions of

dollars in aid to those countries, and initiated a large-scale public affairs campaign to inform

people in these countries of the dangers of making the long journey to the United States and

dissuade them from attempting the journey.  *See, e.g.*, Craig Fugate statement at 4-5 (attached as

Exhibit 21).

Due to these and other challenges in removing high-priority aliens, consistent with

congressional mandates, DHS has had to realign its resources away from non-priority aliens

where possible.  DACA and DAPA are two such efficiencies.  By actively inducing individuals

who are not removal priorities to come forward, submit to background checks, and seek deferred

action from USCIS, DHS is better able to identify priority aliens and concentrate CBP's and

ICE's enforcement resources on such aliens.

### B.  The Challenged Deferred Action Guidance Advances Other Immigration Policy Objectives.

The public interest is also advanced by other equities from the discretion entailed in

DACA and DAPA.  As the Court in *Arizona* acknowledged, "[d]iscretion in the enforcement of

immigration law embraces immediate human concerns."  132 S. Ct. at 2499.  Such discretion

may properly recognize the difference between "unauthorized workers trying to support their

families" on the one hand and "alien smugglers" or those "who commit a serious crime" on the

other hand.  *Id.*  DACA and DAPA appropriately reflect such human concerns.  The injunction

Plaintiff seeks would harm the public by halting policies that promote not only public safety and

national security, but also humanitarian concerns and family unification.  Moreover, Plaintiff's

requested injunction would disrupt the effective enforcement of the law, interfere with the

orderly implementation of the mechanisms for considering some non-priority cases for deferred

action under DACA and DAPA, and impede the harmonization of enforcement priorities among

DHS's component immigration agencies.

The Supreme Court has specifically suggested that family unity is an appropriate factor

for DHS to consider in exercising its enforcement discretion.  *See Arizona*, 132 S. Ct. at 2499

("The equities of an individual case may turn on many factors, including whether the alien has

children born in the United States[.]").  Deferred action impacts the lives of many people.  For

example, as of December 5, 2014, approximately 630,032 individuals have been granted deferred

action under DACA.  *See* DHS, Current Statistics: Deferred Action for Childhood Arrivals:

Pending, Receipts, Rejected, Approvals, and Denials (2014) (attached as Exhibit 22).

### C. Enjoining the Challenged Deferred Action Guidance Would Significantly Undermine The Public Interest.

DHS officials have been instructed to implement the DACA modifications within 90 days

and DAPA within 180 days.  2014 Deferred Action Guidance at 4-5.  A preliminary injunction

would prevent DHS from the timely implementation of this guidance.  It is not in the public

interest to delay policies, such as DACA and DAPA, that promote public safety, national

security, administrative efficiency, and humanitarian concerns.  *See, e.g., Nat'l Res. Def.*

*Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *Hodges v. Abraham*, 253 F. Supp. 2d

846, 873 (D.S.C. 2002); *Gulf Oil Corp. v. FEA*, 391 F. Supp. 856, 864 (W.D. Pa. 1975).  As

explained further above, DACA and DAPA are integral to DHS's efforts to more effectively

administer and enforce our nation's immigration laws, including by allowing enforcement

resources to be focused on high-priority aliens, thereby promoting national security and public

safety, while at the same time addressing the human concerns properly the subject of

immigration enforcement efforts.

### D.  The Challenged Deferred Action Guidance and Exercises of Discretion Can Be Modified At Any Time.

Plaintiff contends that a preliminary injunction is justified because of the "near

impossibility of unraveling the programs once started[.]"  Pl.'s Mot. at 15.  Plaintiff is simply

wrong:  deferred action confers "no substantive right, immigration status or pathway to

citizenship."  DACA Memo at 3; 2014 Deferred Action Guidance at 5.  And deferred action can

be revoked at any time.  DACA Toolkit at 16.

### CONCLUSION

This Court should deny Plaintiff's motion for preliminary injunction and, indeed, dismiss

Plaintiff's complaint for lack of subject matter jurisdiction.


Dated: December 15, 2014                     Respectfully submitted,

                                             JOYCE R. BRANDA
                                             Acting Assistant Attorney General

                                             KATHLEEN R. HARTNETT
                                             Deputy Assistant Attorney General

                                             DIANE KELLEHER
                                             Assistant Branch Director

                                              _/s/ Adam D. Kirschner_____
                                             ADAM D. KIRSCHNER
                                             HECTOR G. BLADUELL
                                             BRADLEY H. COHEN
                                             KYLE R. FREENY
                                             JULIE S. SALTMAN
                                             Trial Attorneys
                                             Civil Division, Federal Programs Branch
                                             U.S. Department of Justice
                                             P.O. Box 883
                                             Washington, D.C.  20044

Tel.: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

*Attorneys for Defendants*