**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSEPH ARPAIO,

                        Plaintiff,

      v.

BARACK OBAMA, ET AL.                     Case 1:14-cv-01966

                      Defendants.

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

## I.    INTRODUCTION

President Barack Obama announced on November 20, 2014 that he, on his own claimed authority, is granting legal status in the United States and the legal right to work in the United States to approximately 4.7 million nationals of other countries who have entered the country illegally or have illegally remained in the United States.  This is in addition to the approximately 1.5 million illegal aliens eligible for President Obama's prior June 15, 2012, DACA Executive Action.

Among many weaknesses of the Defendants' Opposition to the Motion for Preliminary Injunction, is that the Defendants' Opposition and their arguments simply do not relate to the case at bar.

A)  Defendants present this case as an abstract policy disagreement and therefore portray the disagreement as non-justiciable.

B)  The Executive Branch has no legislative authority to set policy other than by

employing the authority delegated to it by Congress.

C)  The exercise of authority delegated from Congress must comply with the procedural

requirements of the Administrative Procedures Act ("APA").

D)  Defendants have not complied with the APA.

E)  It is not an abstract policy agreement whether the APA has been violated or followed.

F)  By arguing this is merely policy disagreement, Defendants confess that their actions

are *ultra vires*, in violation of the U.S. Constitution and the underlying substantive

statutes.

G)  Second, pursuant to 5 U.S.C. § 706(2) of the APA, this Court must hold unlawful and

set aside any agency action that is

> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law; (B) contrary to constitutional right, power,
> privilege, or immunity; [or] (C) in excess of statutory jurisdiction,
> authority, or limitations, or short of statutory right."

H)  Therefore, it is mandatory, by statute, upon the Defendants that they conform their

exercise of delegated authority to the statutory terms and the APA in substance.

I)  Faithfulness and adherence to the underlying statutes is a review commanded by

Congress under the APA.  The issue is grounded in the APA, not in policy disputes.

J)  Third, Defendants attempt to wield authority delegated to them by Congress in

violation of the Non-Delegation Doctrine  as recognized by this Circuit in *American*

*Trucking Associations, Inc. v. United States Environmental Protection Agency*, 175

F.3d 1027 (D.C. Cir. 1999), *modified on reh'g by* 195 F.3d 4 (D.C. Cir. 1999),

*modified by Michigan v. United States EPA*, 213 F.3d 663 (D.C. Cir. 2000) (limiting

the scope of *American Trucking*, stating "[w]here the scope increases to immense

proportions … the standards must be correspondingly more precise") (citations

omitted) *cert. granted sub nom. American Trucking Ass'ns, Inc. v. Browner*, 120 S.

Ct. 2193 (2000).

## II.   DEFENDANTS HAVE OFFERED NO EVIDENCE OR AFFIDAVITS AND THUS PLAINTIFF'S AFFIDAVITS AND FACTUAL RECITATIONS ARE UNCONTROVERTED.

The Defendants have not offered any affidavits, declarations or evidence in support of

their Opposition to a preliminary injunction. Thus the sworn Declaration of Plaintiff is

uncontroverted and must at this stage of the proceeding be accepted as true in any event. As this

honorable Court ruled on December 18, 2014, "at this stage of the proceedings, in opposition to

the defendants' motion to dismiss, the Court need not make any credibility determinations and

must accept as true the factual allegations made by the plaintiff."

However, the Defendants' positions in their Opposition to preliminary injunction, in the

operative Memoranda orders, and the OLC legal opinion depend extensively upon unsupported

assertions of facts and effects that they contend will or will not occur.  The majority of

Defendants' Opposition consists of simply arguing "I don't believe it."

Thus, the Defendants effectively concede the factual allegations of the Plaintiff supported

by sworn declarations.

## III.   STANDARD OF REVIEW AND GOVERNING LAW

Plaintiff set forth the standard of review and governing law for a preliminary injunction

in his motion.  Specifically, the following governing law relates to the initial issue of standing:

Pursuant to 5 USCS § 702, a person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof.  The APA confers a general cause of action upon persons

adversely affected or aggrieved by an agency action within the meaning of a relevant statute, but

restricts that cause of action if the relevant statute precludes judicial review.

Even though Army surveillance was generalized, and involved only observation of public demonstrations, the Supreme Court upheld as a basis for standing "a present inhibiting effect on their full expression and utilization of their First Amendment rights. *Laird v. Tatum* 408 U.S. 1, 28, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).  Defendants there argued that the surveillance was no more intrusive than what a reporter might observe at a public political event.  The plaintiffs could not of course predict which of them if any would be subject to any such surveillance.  Nevertheless, the potential inhibiting  effect on citizens was sufficient for standing. *Id.*

Concerning standing, the Honorable Ellen Segal Huvelle of this Court recently upheld standing against a similar component of the Defendants Executive Action Amnesty programs in *Washington Alliance of Technology Workers v. U.S. Department of Homeland Security*, ("WATA")  U.S. District Court for the District of Columbia, Civil Action No. 14-529, Memorandum Order November 21, 2014, the Honorable Ellen Huvelle, attached hereto.  In upholding "competitor standing" by workers likely to be displaced by foreign workers, Judge Huvelle recited the following governing law:

> "To establish constitutional standing, plaintiff must demonstrate that (1) it has suffered an injury-in-fact, (2) the injury is fairly traceable to the defendant's challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Plaintiff bears the burden of establishing each element of standing. *See Lujan*, 504 U.S. at 561. However, on a motion to dismiss, the Court "'must accept as true all material allegations of the Complaint, and must construe the Complaint in favor of the complaining party.'" *Ord v. Dist. Of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))."

As here, DHS attempted to assert a more exacting and rigorous requirement of standing than exists under governing law.  DHS in the *WATA* case asserted the same kind of rigid

complaints to standing as here:   "DHS argues that plaintiff has failed to provide sufficient detail

of the three named members' training and employment circumstances to establish an injury-in-

fact arising from competition. (Mot. at 13.) In particular, plaintiff did not enumerate the specific

positions to which its named members applied or planned to apply in the future, their

qualifications for the job, or whether the position applied for was filled by an OPT student on a

seventeen-month STEM extension. *Id.* "

 However, such a rigid showing is simply not required for standing. As Judge Huvelle

ruled:

> "These omissions are not, however, fatal to plaintiff's standing, ***for such a
> close nexus is not required****. See Honeywell Intern Inc. v. EPA*, 374 F.3d 1363,
> 1368 (D.C. Cir. 2004) (chemical manufacturer had standing because the
> challenged regulation ***could*** lead customers to seek out the manufacturer's
> competitors in the future); *Int'l Union of Bricklayers and Allied Craftsmen*, 761
> F.2d at 802 (D.C. Cir. 1985) (standing found ***despite lack of details regarding
> specific future jobs*** as to which U.S. bricklayers would compete with foreign
> laborers); *Int'l Longshoremen's and Warehousemen's Union v. Meese*, 891 F.2d
> 1374, 1379 (9th Cir. 1989) (union had standing to challenge Immigration and
> Naturalization Service regulation ***without pleading specific job opportunities lost***
> to Canadian longshoremen). *Cf. Sierra Club v. Jewell*, 764 F.3d 1, at *6 (D.C. Cir.
> 2014) (plaintiff's members need not set foot on disputed property to have interest
> in enjoying it for the purpose of establishing injury)."

> "In *Mendoza*, for example, the Court held that plaintiffs had standing, but
> were not required to show that they applied for and were denied a specific
> position that was filled by a competitor. 754 F.3d 1002. …."

*(Emphases added.)*  Thus, the precision in pleading standard desired by DHS is more than what

is actually required under the law of standing.

>  As stated in *Flast v. Cohen*, 392 U.S. 83, 101,  88 S.Ct. 1942  1953, 20
> L.Ed.2d 947, 'in terms of Article III limitations on federal court jurisdiction, ***the
> question of standing is related only to whether the dispute sought to be
> adjudicated will be presented in an adversary context*** and in a form historically
> viewed as capable of judicial resolution.' Or, as we put it in *Baker v. Carr*, 369
> U.S. 186, 204, 82 S.Ct. 691, 703,  7 L.Ed.2d 663 the gist of the standing issue is
> whether the party seeking relief has 'alleged such a personal stake in the outcome
> of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'

*Laird v. Tatum,* 408 U.S. 1, 26, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) *(Emphasis added.)*

One need not wait to sue until he loses his job or until his reputation is defamed. To withhold standing to sue until that time arrives would in practical effect immunize from judicial scrutiny all surveillance activities, regardless of their misuse and their deterrent effect.

*Id.* at 26

The U.S. Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [FRCP Rule] 12(b)(1) motion," *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999), and the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. See *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *see also Reynolds*, 846 F.2d at 748 (providing that jurisdiction need only be established by a preponderance of the evidence).

In terms of factual allegations, for the purposes of Plaintiff's motion, the Court must accept as true the unopposed affidavits[1] (Exhibit C) of the Plaintiff. Notwithstanding this, the factual assertions of the Plaintiff in his sworn declarations are uncontroverted, as Defendants have failed to proffer any sworn evidence of their own. In this regard, it is clear that Defendants are unwilling to swear to anything for fear of attesting to their misleading statements under oath.

In opposition to the Defendants' FRCP Rule 12(b)(1) challenge to Article III standing – as cited in a Minute Order by Judge Howell in this case on December 18, 2014, at 10:44 EDT, denying live testimony -- "at this stage of the proceedings, in opposition to the defendants'

---

[1] Plaintiff will file his supplemental affidavit tomorrow, December 18, 2014.

motion to dismiss, the Court need not make any credibility determinations and must accept as true the factual allegations made by the plaintiff."

Notwithstanding the legal standards for a preliminary injunction motion, when deciding a motion to dismiss for lack of subject matter jurisdiction, the court generally assumes all factual allegations are true and draws all reasonable inferences as plead in the complaint in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800,* 814-19 (1982); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (stating that "unchallenged allegations of the complaint should be construed favorably to the pleader").

## IV.    STANDING MANDATED BY ALLEGATIONS TAKEN AS TRUE

In addition to Plaintiff's sworn affidavit attached to his motion, the allegations of the Complaint in paragraphs 27 through 32 must be taken as *fact* for the present purposes of a FRCP Rule 12(b)(1) challenge to standing.  Furthermore, pursuant to the Court's order granting leave to file an amended affidavit, Sheriff Arpaio will submit on December 19, 2014, a further affidavit making the following supplemental recitation of non-conclusory and actual fact:

A)    Plaintiff Joe Arpaio as Sheriff has been severely affected by increases in the influx of illegal aliens motivated by Defendant Obama's policies of offering amnesty.

B)    Plaintiff has a direct economic interest in the Defendants' Executive Actions.

C)    The financial impact of illegal aliens in Maricopa County, Arizona was at least $9,293,619.96 in the costs of holding illegal aliens in the Sheriff's jails from February 1, 2014, through December 17, 2014, for those inmates flagged with INS "detainers."

D)      Under current law, Plaintiff Arpaio will turn over those committing crimes in
        Arizona who turn out to be citizens of foreign countries to DHS to be deported.
        By contrast, under the Defendants' new programs, those persons will not be
        subject to deportation (based on newly-committed crimes, at least not without due
        process).  Therefore, those persons committing crimes will serve out their
        criminal sentences in Plaintiff Arpaio's jails, costing his office even more money.

E)      After years of experience with floods of illegal immigrants crossing the border
        into his jurisdiction as Sheriff, Arpaio has many years of empirical, real-world
        experience and evidence showing how the Defendants' programs will directly
        impact his operations.

F)      Plaintiff Arpaio has been severely affected and damaged by Defendant Obama's
        release of criminal aliens onto the streets of Maricopa County, Arizona.

G)      The Office of the Sheriff has already been directly harmed and impacted
        adversely by the Defendants' June 2012 DACA program.

H)      The Office of the Sheriff will be similarly harmed by the Defendant's new
        November 20, 2012, Executive Order effectively granting amnesty to illegal
        aliens.

I)      Based on years of real-world, empirical evidence, prior damage will be severely
        increased by virtue of Defendant Obama's Executive Order of November 20,
        2014, which is at issue.

J)      Plaintiff Joe Arpaio is adversely affected and harmed in his office's finances,
        workload, and interference with the conduct of his duties, by the failure of the
        executive branch to enforce existing immigration laws,

K)     Defendant Obama's past promises of what is in effect amnesty and his DACA amnesty have directly burdened and interfered with the operations of the Sheriff's Office

L)     Defendants' new amnesty executive actions have greatly increased the burden and disruption of the Sheriff's duties.

M)     Experience has proven as an empirical fact that millions more illegal aliens will be attracted into the border states of the United States

N)     Experiences and records of the Sheriff's office show that many illegal aliens – as distinct from law-abiding Hispanic Americans – are repeat offenders, such that Plaintiff Arpaio's deputies and other law enforcement officials have arrested the same illegal aliens for various different crimes.

O)     Plaintiff Arpaio has turned illegal aliens who have committed crimes over to ICE, totaling 4,000 criminals in his jails for state crimes in just an eight-month period. However, over 36 percent keep coming back.

P)     Defendants are not, in fact, deporting illegal aliens convicted of crimes in the State of Arizona. The Plaintiff has booked perpetrators of state-law crimes into his jails, discovered that they are not citizens or Lawful Permanent Residents (LPRs) and then handed those criminals over to ICE at DHS for deportation. Those same illegal aliens placed in DHS custody are then re-arrested for new state-law crimes in Arizona relatively soon thereafter.

Q)     As a result, Defendants will not lower the crime rate by reallocating resources.

R)      The DACA program which started June 15, 2012, has already severely and
negatively impacted Arpaio's office finances, workload, resources, and exposure
to more calls about criminal incidents.

S)      Arpaio's empirical evidence provides a solid predictive basis for what the impact
will be from the November 20, 2014, executive actions.

T)      The President's policies and statements over six years encouraging illegal aliens
to come and seek the promised amnesty actually causes an increase in crime in
Maricopa County, Arizona, including among those who lack any respect for U.S.
laws.

U)      Moreover, Sheriff Arpaio has also been threatened with death threats by some of
the same illegal aliens, which is a constitutional violation against him.

V)      Moreover, because under the "Motor Voter" law, deferred action recipients will
be presented with an application to register to vote at the same time they obtain a
driver's license, hundreds of thousands of the 5 million will either believe that
they are entitled to vote because government officials are inviting them to register
or won't care about breaking U.S. law having already broken U.S. law to enter the
country unlawfully. This impacts Plaintiff directly since he, an elected official,
has a reputation for being tough on illegal immigrants.

W)      Because Sheriff Arpaio is an elected official, Plaintiff will be harmed by illegal
aliens voting against him who can register to vote only because they have and will
easily receive an Employment Authorization Card under Defendants' executive
actions, which gives rise to a drivers' license which allows them to register to
vote.

V.     **DEFENDANTS' CHALLENGE TO PLAINTIFF'S STANDING**

Defendants futilely challenge standing by the Plaintiff on the following meritless

grounds:

A)  Defendants characterize the case as an abstract disagreement over policy.

B)  Defendants argue that "Plaintiff has failed to allege any concrete injury whatsoever to

the Maricopa County Sheriff's Office."

C)  Defendants argue that "Plaintiff has failed to allege any concrete injury … traceable

to the DHS policies challenged in this case," and that "Plaintiff fails entirely to

connect these alleged harms to the DHS policies challenged in this litigation."

D)  Although Defendants acknowledge that the Complaint alleges "harm that the

Sheriff's Office allegedly incurs as a result of illegal immigration," Defendants

dismiss those allegations as being speculative.

E)  Defendants further object under "the general principle that 'a citizen lacks standing to

contest the policies of the prosecuting authority when he himself is neither prosecuted

nor threatened with prosecution.' *Linda R. S. v. Richard D.*, 410 U.S. 614, 619

(1973)."  Defendants further argue that "the challenged DHS policies neither direct

Plaintiff to take any action nor restrain him in the performance of any of his duties."

F)  Defendants argue that more illegal aliens will not flood Maricopa County because

they will realize they don't qualify for the technical terms of Defendants' programs.

G)  Defendants argue that in some mysterious way, never explained, granting benefits to

some illegal aliens will allow them to allocate resources to deporting others.

H)  Defendants also challenge whether illegal aliens who break the law to enter the

United States, and cross through or enter Arizona without a job, without connections

to the community, and without a bank account, and without any financial support are

associated with an increase in crime in Arizona and Maricopa County in particular.

I)   Defendants argue that Plaintiff's complaint is with the long-standing refusal of the

Executive Branch to enforce the law, rather than with the instant, recent programs.

J)   Plaintiff's injury would not be redressable by this litigation, because "Enjoining

DACA and DAPA, as Plaintiff seeks to do, would not compel the ultimate removal of

any alien."

Defendants' arguments are without merit.

The Plaintiff has standing under the controlling precedent in this Circuit of *Mendoza v.*

*Perez* (D.C. Cir., Record No. 13-5118, Page 9, June 13, 2014)

> The requirements for standing differ where, as here, plaintiffs seek to enforce
> procedural (rather than substantive) rights. When plaintiffs challenge an action
> taken without required procedural safeguards, they must establish the agency action
> threatens their concrete interest. *Fla. Audubon Soc'y,* 94 F.3d at 664. It is not
> enough to assert "a mere general interest in the alleged procedural violation
> common to all members of the public." *Id.*

> Once that threshold is satisfied, the normal standards for immediacy and
> redressability are relaxed. *Lujan,* 504 U.S. at 572 n.7. Plaintiffs need not
> demonstrate that but for the procedural violation the agency action would have
> been different. *Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1160 (D.C.
> Cir. 2005). Nor need they establish that correcting the procedural violation would
> necessarily alter the final effect of the agency's action on the plaintiffs' interest. *Id.*
> Rather, if the plaintiffs can "demonstrate a causal relationship between the final
> agency action and the alleged injuries," the court will "assume[] the causal
> relationship between the procedural defect and the final agency action." *Id.*

While it is clear that standing requires more than "a mere general interest in the alleged

procedural violation common to all members of the public," the Plaintiff has clearly alleged a

specific injury to his office's finances, resources, and workload, and also personally. He is not a

random citizen.

First, the APA provides a bright-line statutory requirement as explained elsewhere, and

the case is simply not a dispute over policy.   The case, governed by the APA, does not implicate any of the prudential considerations Defendants assert because Congress has legislated and provided a cause of action under the APA. Compliance with the APA, including the APA's requirement to conform with the subject matter legislation, is not a disagreement about policy or politics.  It is a statutory cause of action.

Second, Plaintiff has quite obviously pled concrete injury, which allegations must be accepted as true at this stage.  The Plaintiff has provided in his sworn .s that – based on many decades of experience – the Sheriff's Office has and will incur additional expenses, workload, drain on its resources, and danger to personnel out on patrol, as well as many other enumerated injuries.

Third, Plaintiff has quite obviously pled that the concrete injury has already been caused by Defendants' June 2012 DACA program and will be caused by Defendants' November 2014 executive actions, which allegations must be accepted as true at this stage.  Arpaio alleges under oath that the June 15, 2012, DACA program has already caused the adverse effects that he claims will be repeated now after the November 20, 2014, Executive Action Amnesty.  Plaintiff is challenging the 2012 DACA.  Plaintiff alleges and avers under oath that his Office has already experienced from the 2012 DACA program increased expenses, workload, drain on resources, and risk for patrolling personnel.

Fourth, while Defendants strive mightily to tar the Plaintiff's allegations as "speculative," Sheriff Arpaio's office has decades of real-world experience and empirical evidence in how increases in criminal activity within Maricopa County, Arizona, are correlated with Federal policies and programs that are perceived by nationals of foreign countries as an engraved invitation to come to the United States for current or future amnesty.  What Defendants seek to

characterize as "speculative" is actually the most compelling, real-world experience possible based on personal knowledge and belief.

Contrary to the assertions of the Defendants, a reasonable inference or prediction of an injury satisfies standing.  "According to NRDC, the Guidance exacerbates these injuries by delaying or suspending future air quality improvements. Any such effect, EPA counters, is purely hypothetical because it may never approve an alternative. "*Natural Resources Defense Council v. Environmental Protection Agency*, 643 F.3d 311 (D.C. Cir. July 1, 2011).

In the 2011 *NRDC v. EPA* case, Plaintiff claimed members living in air quality non-attainment areas.  The members alleged – but could not possibly prove to the standards of proximate causation – that ambient air quality affected their health either individually nor to any medical diagnosis or medical certainty.   The EPA further objected that it was highly speculative to claim that allowing an alternative means of attaining air quality that would be necessity is "not less stringent" could cause any harm to the plaintiffs.  Nevertheless, this Circuit only three years ago found standing to challenge agency action.

Furthermore, it is clear that only a partial contribution making a problem worse is sufficient for standing.  *Id.*  Making an existing problem worse clearly establishes standing.  *Id.* For example, in *Natural Res. Def. Council v. Envtl. Prot. Agency* (D.C. Cir., 2014), Plaintiffs were persons living in the general region around power plants that might conceivably switch to the fuels challenged under the challenged administrative rule, but it was unknown if any of the plants actually would use the fuels in question:

> "Once EPA promulgated the Comparable Fuels Exclusion, it was " 'a hardly-speculative exercise in naked capitalism' " to predict that facilities would take advantage of it to burn hazardous-waste-derived fuels rather than more expensive fossil fuels. *Id.* (inferring that "motor carriers would respond to the hours-increasing provisions by requiring their drivers to use them and work longer days" (quoting *Abigail*

*Alliance for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 135 (D.C. Cir. 2006))). And the Intervener does not dispute that, as it turned out, many facilities did just that.

Therefore, a predictive, strong "inference" that harm will result to the Plaintiff from the agency action is routinely held to be sufficient to constitute standing.

Fifth, Sheriff Arpaio is not suing as just a random citizen complaining that someone else was not prosecuted, but as an elected Sheriff and government official whose resources and budget are directly harmed.  Defendants contend that the Defendants' actions do not direct Sheriff Arpaio to take any action nor restrain him in the performance of his duties.  That is incorrect.  Under current law, the Sheriff's Office hands nationals of foreign countries who violate laws over to the DHS (ICE) for deportation.  Under Defendants' new programs, because illegal aliens who break the law are not subject to deportation, they have and will remain imprisoned in Sheriff Arpaio's jails, costing the Sheriff's Office money.

Indeed, if the Court applied the Defendants' approach to standing on this point, then the U.S. Government would not have had standing to challenge Arizona's SB1070 law in *Arizona v. United States*, 132 S. Ct. 2492 (2012).  There, Arizona's SB1070 law did not prohibit the U.S. Government from taking any action nor require the U.S. Government to do anything by Arizona's state-level statute.  SB1070 simply agreed with Federal immigration law and encouraged Arizona personnel to hand illegal aliens over to DHS in compliance with existing law.  Yet speculation that the U.S. Government might be encouraged to more faithfully execute existing laws in its enforcement activities by SB 1070 gave the U.S. Government standing to sue the State of Arizona.  Clearly there was no standing by the United States to sue Arizona if we followed the Defendants' analysis here.

Sixth, Sheriff Arpaio has real world experience and empirical evidence that illegal aliens

are in fact attracted to enter or cross through Arizona, committing a trail of crimes along the way, regardless of whether they have read the fine print of U.S. immigration policies or whether they technically qualify for the latest Federal program encouraging illegal immigration.  It is an empirical fact that illegal aliens who do not qualify for current amnesty or deferred action programs do not know or care if they qualify, but are motivated to enter the country on the expectation that if one group of illegal aliens is granted amnesty, they will get amnesty in the next wave or the next program.

Seventh, injury to sustain standing need not be all-or-nothing, a light switch.  Defendant's actions will make the injury to Sheriff Arpaio's office worse than it was in recent years.  While there is a long-standing problem with the Executive Branch's flagrant refusal to obey or enforce the law, the fact that Defendants' programs will make the problem worse is sufficient for standing.  Past problems provide an empirical basis that the problem will get worse.

As explained in this Circuit in *Natural Resources Defense Council v. Environmental Protection Agency*, 643 F.3d 311 (D.C. Cir. July 1, 2011), "In any event, even assuming that a resulting program were perfectly equivalent, the delay in improving air quality would still injure NRDC members."  So mere delay in enforcement is sufficient to establish standing as to persons living vaguely in the vicinity of plants which might or might not choose to use the alternative fuel, who might or might not be medically affected in ways that cannot be proven medically or as proximate causation. "

Furthermore, this Circuit in 2011 considered in its standing analysis whether anyone else would have standing:  "Were EPA to prevail, although NRDC might well have standing to bring an as-applied challenge to any particular "not less stringent" determination, no one would have standing to challenge EPA's authority to allow alternatives in the first place.  Especially given

that Congress enacted Subpart 2 for the very purpose of curtailing EPA discretion, *see Am. Trucking,* 531 U.S. at 484-86, 121 S. Ct. 903, it would be ironic indeed if the application of standing doctrine allowed EPA to effectively maintain that very discretion. Neither precedent nor logic requires us to adopt such a counterintuitive approach to standing." *Id.*

Eighth, Defendants are compelled under law enacted by Congress to remove illegal aliens.  The Defendants' unconstitutional executive actions illegally contravene current law to relieve the Executive Branch from the obligation imposed by Congressional enactment. Therefore, enjoining the Defendants' programs would leave in place current law, under which they are indeed compelled to deport nationals of foreign countries unlawfully present in the country.  However, enjoining the program would also immediately signal to potential future trespassers that they cannot expect to receive amnesty.

*Lujan v. Defenders of Wildlife,,* 504 U.S. 555, 562, 112 S.Ct. 2130 (1992) explains that where a plaintiff's asserted injury arises from the government's allegedly unlawful regulation [of a third party]" the critical question is how the third party would respond to an order declaring the government's action illegal.

## VI.    DEFENDANTS DID NOT OPPOSE WHAT PLAINTIFF SEEKS: DEFENDANTS' PROGRAMS ARE NOT ENFORCEMENT DISCRETION

Defendants extensively brief and argue the case as grounded only on the Executive Branch's inherent authority to engage in enforcement discretion.

Fatal to the Defendants' argument, however, is the reality that Defendants June 2012 DACA and November 2014 Executive Action Amnesty are not exercises of prosecutorial discretion.

As analyzed and explained by U.S. District Judge Arthur J. Schwab, in *United States v. Elionardo Juarez-Escobar,* in the United States District Court for the Western District of

Pennsylvania (Criminal Case No. 14-0180, December 16, 2014), Defendants' Executive Actions do not qualify as prosecutorial discretion or enforcement discretion.  *See*, Exhibit A, attached.

## VII.    DEFENDANTS PROGRAMS ARE UNCONSTITUTIONAL OR UNLAWFUL: DEFENDANTS ADMIT THAT PROGRAMS ARE UNLAWFUL

As Plaintiff briefs already in the Motion, the Executive Branch has no authority to set policy in this area, as Defendants claim.  As further analyzed and explained by U.S. District Judge Arthur J. Schwab, in *United States v. Elionardo Juarez-Escobar*, in the United States District Court for the Western District of Pennsylvania (Criminal Case No. 14-0180, December 16, 2014), the Defendants' programs are unconstitutional. Judge Schwab ruled that:

President Obama contended that although legislation is the most appropriate course of action to solve the immigration debate, his Executive Action was necessary because of Congress's failure to pass legislation, acceptable to him, in this regard. This proposition is arbitrary and does not negate the requirement that the November 20, 2014 Executive Action be lawfully within the President's executive authority. It is not.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587.

Congress's lawmaking power is not subject to Presidential supervision or control. *Youngstown*, 343 U.S. at 587. Perceived or actual Congressional inaction does not endow legislative power with the Executive. This measurement - - the amount/length of Congressional inaction that must occur before the Executive can legislate - - is impossible to apply, arbitrary, and could further stymie the legislative process.

President Obama stated that the only recourse available to those members of Congress who question his wisdom or authority in this regard would be to "pass a bill" and that "the day I sign that bill into law, the actions I take will no longer be necessary." Presidential action may not serve as a stop-gap or a bargaining chip to be used against the legislative branch. While "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," it does not include unilateral implementation of legislative policies. *Utility Air Regulatory Group v. E.P.A.,* 134 S.Ct. 2427, 2446 (Jun. 23, 2014).

This Executive Action "cross[es] the line," constitutes "legislation," and effectively changes the United States' immigration policy. The President may only "take Care that the Laws be faithfully executed . . . "; he may not take any Executive Action that creates laws. U.S. Const., Art. II, § 3.

## VIII.   PAST DEFERRED ACTION DOES NOT MAKE DEFERRED ACTION LEGAL

Plaintiff also rejects the validity of the Defendants' deferred action programs as being grounded mainly on past practice.  The fact that the Executive Branch has acted unlawfully in the past does not make its actions lawful now.   Contrary to public discussions out of court about reactions to different Presidents, Plaintiff's counsel has actually sued the prior Bush Administration over various matters and does not accept these practices as lawful no matter who engaged in them.

Defendants argue on Page 8 of the Opposition that Congress specified specific circumstances in which deferred action status will be available.  Fatal to their Executive Actions now, however, Congress has not authorized deferred action in the situations and in the wide breadth involved here.

IX.   **IN THE UNLIKELY EVENT THAT PRESIDENT OBAMA'S SO-CALLED EXECUTIVE ACTIONS ARE NOT DEEMED UNCONSTITUTIONAL, WHICH IT UNDOUBTEDLY IS, PRESIDENT OBAMA AND THE OTHER DEFENDANTS ACTED IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA) THROUGH WHAT IN EFFECT AMOUNTS TO HIS ILLEGAL RULE-MAKING.**

President Obama has attempted to nullify the law of the United States, enacted by Congress, with regard to immigration and the presence of aliens who are working in the country, by ordaining Executive Actions followed by "guidance" Memoranda ("Memoranda orders") being issued by the Secretary of the Department of Homeland Security, Jeh Charles Johnson.

As mentioned above, the primary and dominant feature of these executive actions is that the Defendants have established a complex regime to confer affirmative benefits upon approximately 40% of the estimated citizens of foreign countries residing illegally in the U.S.

It is true that a Congressionally-enacted statute does allow the Attorney General (apparently now the Secretary DHS) to make a "determination" – that is, an individualized decision on a case-by-case basis – whether to grant an Employment Authorization Card to a person whose deportation has been deferred.  However, the Defendants have erected a complex regulatory scheme whose centerpiece "Holy Grail" is the coveted right to work in the United States.  Even though a statute allows the granting of work permit if the Attorney General "determines" it to be appropriate, the Defendants are still setting up a regulation under which that power will be exercised.  This scheme replaces the Attorney General's "determin[ation]" with a set of broad criteria intended to automatically cover approximately 40% of all illegal aliens.

Under the Executive Actions and applicable administrative guidance, an undocumented immigrant is automatically eligible for deferred action if he or she applied for deferred action and if he or she:

> (1) is not an enforcement priority under Department of Homeland Security Policy;

20

  (2) has continuously resided in the United States since before January
    1, 2010;
  (3) is physically present in the United States both when Homeland
    Security announces its program and at the time of application for
    deferred action;
  (4) has a child who is a U.S. citizen or Lawful Permanent Residence;
    and
  (5) presents "no other factors that, in exercise of discretion, make[] the
    grant of deferred action inappropriate."

Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C., 25, November 19, 2014, citing Johnson Deferred Action Memorandum at 4.

  The Department of Homeland Security has issued an operative Memorandum to reflect the priorities for deportation referenced in President Obama's November 20, 2014 Executive Action. Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, November 20, 2014. Individuals who may otherwise qualify for deferred deportation under the Executive Action, will not be permitted to apply for deferred action if they are classified in one of the three (3) categories of individuals who will be prioritized for deportation. The Secretary of the Department of Homeland Security provided that the civil immigration enforcement priorities (apprehension and removal) will be as follows:

- Priority 1 (threats to national security, border security, and public safety), which includes those who: are engaged in or suspected or terrorism or espionage; are apprehended attempting to enter the United States; have been convicted of an offense involving gangs; have been convicted of a felony "other than a state or local offense for which an essential element was the alien's immigration status"; and have been convicted of an "aggravated felony";

- Priority 2 (misdemeanants and new immigration violators), which includes those who have been: convicted of three or more misdemeanor offenses arising out of

three separate incidents (other than minor traffic offenses or state or local offenses involving their immigration status); convicted of a "significant misdemeanor"; apprehended after "unlawfully entering or re-entering the United States and cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014"; and found to have significantly abused the visa or visa waiver programs; and

- Priority 3 (other immigration violations), which includes those who have been issued a final order of removal on or after January 1, 2014.

Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (emphasis added).

The operative Memoranda set forth that individuals in all three (3) of these priority groups should be removed from the United States unless they qualify for asylum or other forms of relief. Further, undocumented immigrants who are not within these categories may be removed "provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* All decisions regarding deportation are to be based on the totality of the circumstances. *Id.*

These operative Memoranda orders thus establish complex and detailed rules governing broad categories of persons and circumstances. The very nature of these Executive Actions is to create a standardized approach which produces exactly the same result in each and every case and there is only one possible outcome which is granted to all whom meet the general criteria. All those who meet the criteria get the "Holy Grail" of the right to work in the United States, creating a magnet for more millions of illegal aliens to rush the borders.

The millions of persons who meet the regulatory criteria get only one possible result: they are granted deferred action and are entitled to both remain in the United States and are given the legal right to work as well. Those who do not meet the regulatory criteria do not get that result,

and receive no change from their current status. This extends beyond prosecutorial discretion and replaces individual decision-making with mass standardization.  Ultimately, President Obama's so-called Executive Actions are rule-making subject to the provision of the APA.

**X.**     **THE EXECUTIVE ACTIONS AND MEMORANDA ARE NOT GENERAL STATEMENTS OF POLICY BUT ARE RULE-MAKING AND NOT POLICY.**

Defendants argue that their Executive Actions and Memoranda Orders "reflect[] a general statement of policy by the agency, a type of agency action that the APA explicitly exempts from the notice-and-comment requirements."  Defs. Opp. at p.33.  It is thus Defendants' position that if they label the Executive Actions "general statements of policy" that they circumvent the legislative process.  This argument has no merit. Pursuant to the above facts, and well-established law, Defendants' operative Memoranda orders are legislative rules that must comply with the APA's procedural and substantive requirements and are not general statements of policy.

This Circuit has rejected the proposition that an agency can escape judicial review under Section 704 by labeling its rule an "informal" guidance document   *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986); *see also Continental Airlines, Inc. v. CAB,* 173 U.S. App. D.C. 1, 522 F.2d 107, 124 (D.C. Cir. 1974) ("The label an agency attaches to its action is not determinative.").  Since the labeling of the Executive Actions is thus irrelevant, the actions themselves must be compared to previous court holdings.

In *Nicholas v. INS*, 590 F.2d 802, 807-08 (9th Cir. 1979), the U.S. Court of Appeals for the Ninth Circuit held that Immigration and Naturalization Service's[2] ("INS")'s 1978 "instructions" regarding deferred action constituted a substantive rule requiring rule-making formalities under the APA. Further, in *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)*,* the U.S.

_____

[2] Recently re-organized into the United States Citizenship and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE).

Supreme Court held that the Bureau of Indian Affairs ("BIA") could not create "eligibility requirements" for allocating funds among Native Americans without complying with the APA requirements to establish the criteria as regulations. *Id.* at 230 - 236. Here, like the BIA, the DHS created eligibility criteria in a similar fashion.  DHS' criteria determine the right of millions of people to remain in the United States.  Since eligibility to receive funding triggers the APA under *Ruiz*, then eligibility for deferred action also does.

Second, the operative Memoranda orders are also legislative rules subject to the rulemaking requirements of the APA because they are substantive rules. A rule is substantive (and hence must comply with the APA) "if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted) In *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C. Cir. 1997) the D.C. Circuit held that the primary distinction between a substantive rule and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position. *Id.*; *see also American Bus Ass'n v. United States,* 627 F.2d 525, 532 (D.C. Cir. 1980).

Even more, the Memoranda orders are legislative rules subject to the rulemaking requirements of the APA because each order "puts a stamp of agency approval or disapproval on a given type of behavior," as analyzed by *Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999).  In *Chamber of Commerce*, this Circuit held that the Department of Labor promulgated a substantive rule when it told employers that they could avoid 70-90% of workplace inspections if they participated in a new "Cooperative Compliance [Executive Action]." 174 F.3d at 208.

Here, similarly, the Defendants establish criteria and Executive Actions so that those who participate are designated lower-risk and can avoid enforcement and prosecutorial action by their participation in the Executive Action, thereby allocating enforcement activity. As a result, the Defendants must comply with the rule-making procedures imposed by the APA, including posting a precise Notice of Proposed Rule-Making (NPRM) in the Federal Register and receiving, reviewing, and analyzing public comments before finalizing any regulation.

Thus, for the reasons shown above, Defendants' Memoranda orders are subject to the provisions of the APA.

> **a.      President Obama's In Effect Illegal Rule-Making Violates Federal Law Because Notice Of The Rule-Making Should Have Been Published In The Federal Register For Public Comment, As It Affects A Wide Swath Of People And Businesses, And The Substantive Rule Was Not Published At Least Thirty Days Before Its Effective Date.**

The APA establishes the procedural requirements for notice-and-comment rule-making. 5 U.S.C. § 553(b) of the APA states that "[g]eneral notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). Finally, "the required publication or service of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

Congress passed the APA in an effort "to improve the administration of justice by prescribing fair administrative procedure." David B. Chaffin, Note, *Remedies for Noncompliance with Section 553 of the Administrative Procedure Act: A Critical Evaluation of United States*

*Steel and Western Oil & Gas*, 1982 Duke L.J. 461, 462 (1982), available at

http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=2809&context=dlj.[3]

> There are several reasons for immediately invalidating a challenged rule following a finding of noncompliance with section 553. First because section 553 procedures serve to educate agencies and apprise them of the public interest the rule may be inaccurate and contrary to the public interest, and thus unworthy of being extended. Second, enforcement of a rule that results from improper procedure runs afoul of fundamental notions of democratic government. Third, leaving the rule temporarily in effect may have undesirable effects on the procedures on remand.

*Id.* at 471. "When a court allows such a rule to remain in force, it extends the life of an

illegitimate exercise of power and [ ] promotes abuses of [ ] power." *Id.* at 474.

"Since the enactment of the APA, numerous rules have been challenged on the ground

that the promulgating agency did not comply with the procedural requirements of section 553."

*Id.* at 464. "Most courts sustaining such procedural challenges immediately invalidate the rule

and remand the case to the agency with instructions to follow proper section 552 procedures. The

[D.C. Circuit] followed this practice in *Tabor v. Joint Board for Enrollment of Actuaries*[, 566

F.2d 705 (D.C. Cir. 1977)]." *Id.* at 464-66.

In *Tabor*, experienced actuaries challenged regulations establishing standards and

qualifications for persons performing actuarial services for pension plans to which . . . (ERISA)

applies. The actuaries argued, *inter alia*, that the Joint Board had violated section 553 by failing

to publish a statement of basis and purpose with the rules. [Although] the district court granted

the Board's motion for summary judgment[,] [t]he Court of Appeals for the [D.C. Circuit]

---

[3] (Citing Senate Comm. On The Judiciary, Administrative Procedure Act: Report Of The Committee On The Judiciary, S. Rep. No. 752,79th Cong., 1st Sess. 7 (1945), *reprinted in* Legislative History Of The Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 1, 187 (1946)).

reversed, vacating the rules and remanding the case to the Board 'to enable it to adopt new rules accompanied by a contemporaneous statement of basis and purpose.' *Id.* at 466.

Moreover, in *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), the this Circuit held that the Administrator in that case "erred in declining to adhere to the notice-and-comment requirements of section 553 of the APA." This Circuit emphasized "that judicial review of a rule promulgated under an exception to the APA's notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed." *Id.*

In *Am. Bus Ass'n v. United States*, 627 F.2d 525 (D.C. Cir. 1980), the D.C. Circuit found that section 553 "was one of Congress's most effective and enduring solutions to the central dilemma it encountered in writing the APA reconciling the agencies' need to perform effectively with the necessity that 'the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure.'" 627 F.2d at 528.

In sum, this Circuit has found it "commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive." *New Jersey*, 626 F.2d at 1045. Accordingly, this Circuit ruled that "the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced." *Id.*

If President Obama, in "'carrying out [his] 'essentially legislative task,' ha[d] infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, [he would] thereby have 'negated the dangers of arbitrariness and irrationality in the formulation of rules . . . ." *See id.* (quoting *Weyerhaeuser Co. Costle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978).

As such, at a minimum, President Obama's proposed illegal rule-making should have been made available for public comment, as it is unlawful to have not done so by intentionally not publishing it in the Federal Register.

President Obama, however, decided to ignore the commonplace practice of following the procedures listed in the section 553 of the APA. As President Obama's in effect illegal rule-making will affect a swath of people and businesses, the President "must always learn the . . . viewpoints of those whom its regulations will affect. . . . [P]ublic participation . . . in the rule[-]making process is essential in order to permit administrative agencies to inform themselves." Chaffin, *supra* at 471.[4] (Exhibit B).

Accordingly, the Court should invalidate President Obama's in effect illegal rule-making, as it is consistent with the D.C. Circuit's past decisions and remedies in a plethora of cases concerning section 553 violations.

### b.    President Obama Violated APA, 5 U.S.C. § 706 Because His In Effect Illegal Rule-Making Conflicts With Congressional Law.

The APA prohibits federal agencies from authorizing what Congress has prohibited. *See, e.g.*, *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Defendant Obama and the other Defendant's DACA and Executive Action Amnesty directly conflicts with congressional law and is thus an illegal and invalid agency action pursuant to 5 U.S.C. §§ 702-06.

Pursuant to 5 U.S.C. § 706(2), the APA requires this Court to hold unlawful and set aside any agency action that is:

---

[4] "[A] rule of broad scope affects many individuals and therefore requires consideration of a wide variety of viewpoints to define the public interest." Chaffin, *supra* at 471.

28

> (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; [or] (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

Concerning the substance of agency action, an agency cannot promulgate a rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Specifically, an agency's rule cannot conflict with what Congress has said in Congressional enactments.  *Id.* § 706(2)(A).

## XI.   DEFENDANTS' EXECUTIVE ACTIONS AND MEMORANDA ORDERS CONFLICT WITH CONGRESSIONAL ENACTMENTS

### a.    Congressional Law on Detention and Removal of Illegal Aliens.

Under 8 U.S.C. § 1225, every person who is not legally present in the United States "shall" be "inspected" by immigration officers (DHS personnel) and if the officer determines that the individual is not clearly and beyond a doubt entitled to be admitted, the individual "shall be detained" for removal proceedings. 8 U.S.C. § 1225(a)(1), (3), (b)(2)(A).

This imposes a mandatory duty on the executive branch. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 1744422, at * 8 (N.D. Tex. Apr. 23, 2013) (holding that 8 U.S.C. § 1225 imposes a mandatory duty and explaining that "[t]he Supreme Court has noted that Congress's use of the word 'shall' in a statute imposes a mandatory duty on an agency to act.") (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)).

This mandatory duty extends to the removal of any undocumented immigrant present in violation of federal law, unless Congress provides a specific exception. *See* 8 U.S.C. §§ 1182, 1227(a)(1), 1229(b), 1254 (setting standards for inadmissibility and categories for deportability, along with limited statutory exceptions, such as cancellation of removal and temporary protected status). Thus, Congress has provided that it is illegal for undocumented immigrants to be in the United States and has required the executive branch to remove those individuals.

**b.      Congressional Law On Undocumented Parents Of U.S. Citizen Or Legal Permanent Residents.**

Congress has further enacted an elaborate statutory scheme governing the lawful presence of undocumented parents of U.S. citizens or legal permanent residents. *See, e.g.*, 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255.

Title 8 specifies a precise mechanism by which parents of U.S. citizens may apply to stay in the country lawfully.  In particular, the parents must meet certain strict requirements: they must (i) wait until their child turns twenty-one (21), (ii) voluntarily leave the country, (iii) wait 10 more years, and then (iv) obtain a family-preference visa from a U.S. consulate abroad. 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. Congress also has provided that it is "unlawful" for anyone to hire an "unauthorized alien." Id. § 1324a(a)(1). Congress specifying the proper mechanism prevents DHS from now creating its own. *See, e.g.*, *API v. EPA*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit.").

**c.      Defendant's Memoranda Orders Are Not "In Accordance With" The Laws Enacted By Congress.**

Defendants' Memoranda orders create legal rights for millions of undocumented immigrants and do so by rewriting the immigration laws and contradicting the priorities adopted by Congress.

First, contrary to 8 U.S.C. § 1225's requirements, Defendants have now ordered that immigration officers shall *not* "inspect[ ]" or institute "removal proceedings" against 4 to 5 million of the eleven million undocumented immigrants in the United States. Defendants have thus over-ruled the operation of 8 U.S.C. § 1225 for nearly 40% of the estimated illegal aliens that 8 U.S.C. § 1225 commands them to deport.

Furthermore, Defendants have announced that all 5 million of these illegal aliens will receive work permits, without following the mandatory procedures for classifying a category of undocumented immigrants as work-eligible. *See, e.g.*, 8 U.S.C. § 1324(a) (barring any hiring of an "unauthorized alien"); 8 C.F.R. § 274a.12 (providing, by regulation, narrowly defined "[c]lasses of aliens authorized to accept employment").

Authorizing work permits for an entire category of millions of individuals legally prohibited from employment exceeds any discretion Defendants have to issue work permits and contradicts Defendants' statutory duties to deport those persons. Thus, Defendant Obama and the other Defendants' Executive Actions violate the requirements of the APA because the reversal of the executive branch's positions in conflict with existing regulations and law is necessarily arbitrary, capricious, arbitrary, an abuse of discretion, unreasonable, and otherwise not in accordance with law. If the previously promulgated regulations were well grounded in law and fact, then a dramatic departure from those regulations most likely cannot also be well grounded in law and fact.

As such, the DHS operative Memoranda Orders violate the aforementioned provisions in 5 U.S.C. § 706, and they are therefore unlawful and invalid. *See, e.g. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2208 (2012) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law [or] in excess of statutory jurisdiction [or] authority.") (quoting 5 U.S.C. §§ 706(2)(A), (C)).

XII.    **EVEN IF THERE WAS PROPER NOTICE-AND-COMMENT RULE-MAKING, WHICH THERE WAS NOT, A RATIONAL BASIS FOR THE SUBSTANTIVE RULE DOES NOT EXIST.**

Requirements of administrative rationality flow from several sources, principally the Due Process Clause of the Fifth Amendment and the APA. *See* Adrian Vermeule, Rationally Arbitrary Decisions (in Administrative Law), Harvard Pub. L. Working Paper No. 13-24 at *3 (Mar. 2013),[5] 5 U.S.C. § 706 states, in relevant part, that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> As relevant here, the APA, requires that agencies (1) must act within the bounds of their delegated statutory mandates; (2) must provide 'substantial evidence' or at least a reasoned evidentiary basis for their factual findings; (3) and, most crucially for my purposes, must offer reasons for their policy choices, reasons that connect the facts found to the choices made. The last requirement stems most directly from Section 706(2)(A) of the Act, requiring courts to set aside agency action that is 'arbitrary, capricious, [or] an abuse of discretion[, also known as 'rationality review'].

Vermeule, *supra* at 3.

> In a recent decision, *New York v. Nuclear Regulatory Commission* (681 F.3d 471 [D.C. Cir. 2012]), the Court of Appeals for the District of Columbia Circuit -- the nation's premier administrative-law tribunal -- went so far as to use language incautiously suggesting that an agency assessing the environmental consequences of its action must articulate an expected harm analysis that 'examine[s] both the probability of a given harm occurring and the consequences of that harm if it does occur.'

*Id.* at 4.

---

[5] available at http://www.law.harvard.edu/faculty/faculty-workshops/faculty-workshop-secure/vermeule.faculty.workshop.spring2013.pdf .

Although the scope of review under the arbitrary and capricious standard is narrow and the court is not empowered to substitute its judgment for that of the agency, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), the agency must provide a "rational connection between the facts found and the choice made" so as to afford the reviewing court the opportunity to evaluate the agency's decision-making process. *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 220 (D.C. Cir. 2013); *see also Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

While 'we have long held that agency determinations based upon highly complex and technical matters are entitled to great deference,' *Domestic Secs., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003) (quotation marks and brackets omitted), 'we do not defer to the agency's conclusory or unsupported suppositions.' *Muwekma Ohlone Tribe*, 707 F.3d at 220; *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

Even as a matter of policy, which Defendants miserably argue gives them the right to override Congress and do as they please, the Executive Actions and operative Memoranda orders are unconstitutional as failing the rational basis test for the exercise of delegated authority in administrative law. Defendant Obama and the other Defendants' justification for granting amnesty is that the amount of resources and effort it would take to track down and deport illegal aliens is excessive. However, not granting work permits would encourage many illegal aliens to voluntarily return home if they find it difficult to find employment in the United States. Thus is no rational basis for the executive branch to grant employment authorization to work within the United States as part of granting amnesty or deferred removal of illegal aliens.

**XIII.**   **A MULTITUDE OF POLICY CONSIDERATIONS WARRANT THE INVALIDATION OF PRESIDENT OBAMA'S IRRATIONAL SO-CALLED EXECUTIVE ACTIONS AND EVEN IF THE EXECUTIVE ACTIONS AT ISSUE ARE POLICY, WHICH THEY ARE NOT LEGALLY, THERE IS NO RATIONAL BASIS FOR THEM.**

There are many policy reasons why President Obama's executive amnesty will cause immediate harm. For one, the Obama administration is hiring 1,000 new workers to quickly process applications for amnesty. As the new workers in Crystal City, Virginia, clearly won't have any expertise in immigration, they will rubber-stamp every application.

The 5 million illegal aliens slated to receive amnesty will also be granted a work permit, technically called an Employment Authorization Card. The card can be used in most states to receive a driver's license. Under the "Motor Voter" law, people are encouraged by the government to register to vote while getting a driver's license. When officials invite them to register to vote, illegal aliens with little understanding may accept the invitation. Illegal aliens could think they wouldn't be asked to register if they shouldn't. Moreover, our voting registration system runs mostly on the honor system. Nobody investigates until there is a complaint. Even if due to misunderstanding, we could have millions of illegal aliens actually voting in the 2016 election. The amnesty to illegal aliens could start tilting elections as early as 2015.

In addition, many businesses will face legal jeopardy when they hire employees because of President Obama's lawlessness. Approximately 5 million new illegal aliens may now show up at your business applying for a job holding an "Employment Authorization Card." This is a modern work permit—it is the same work permit that legal immigrants get when they come to the country honorably, above board and playing by the rules. As such, a business will not know if the applicant is legally in the country or not, as there is no clue how or why a person got the

work permit.

President Obama does not have the legal authority to implement if so-called executive action, and as a result, we will have 5 to 6 million illegal aliens throughout the country presenting Employment Authorization Cards (historically an Employment Authorization Document) to get jobs, placing employers in an untenable and risky position. On the one hand, it is illegal to hire an employee or independent contractor who is an illegal alien. If a lawbreaker's work permit is invalid, then the employer is breaking the law by hiring him or her. On the other hand, it is illegal to discriminate in the workplace based upon nationality, citizenship or immigration status. In the "Alice in Wonderland" world of immigration policy, it is illegal to ask if a job applicant is legally present in the country.

Thus, one has no way of knowing if an individual job applicant has a valid work permit as a lawful immigrant or an unconstitutional executive action work permit. Therefore, businesses may be forced into breaking federal law, based on whether the president does or does not have the legal power to grant amnesty to illegal aliens. For the time being, employers must accept an Employment Authorization Card as legitimate until the courts rule otherwise.

In sum, Defendants' Executive Actions are not rationally based and they do not even legally qualify as policy, which Defendants maintain in their opposition justifies their deviation from the strictures rule-making under the APA, notwithstanding the unconstitutionality of their conduct.

For the aforementioned reasons, Defendants' so-called Executive Actions must be ruled null and void.

XIV.   **CONCLUSION**

The Court should grant Plaintiff's motion and enter a preliminary injunction that, during the pendency of this suit, orders Defendants to cease and desist and not initiate the plans for Executive Actions directed by the President to DHS and his Attorney General.  This will work no harm to Defendants, as the status quo of existing law enacted by Congress will be preserved. It is not right or just that the President and the other Defendants circumvent the will of the people in our Republic, simply because they believe that the new Congress will not tow the line to their goals for immigration reform.


Dated: December 18, 2014

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0830
leklayman@gmail.com
*Attorney for Plaintiff*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of December, 2014 a true and correct copy of the foregoing Reply to Defendants' Opposition to Motion for Preliminary Injunction (Civil Action Nos. 14-cv-1966) was submitted electronically to the District Court for the District of Columbia and served via CM/ECF upon the following:

ADAM D. KIRSCHNER
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov
*Attorney for Defendants*

Respectfully submitted,


 /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800